[Sac. No. 4975. In Bank.—February 28, 1936.]

RUDOLF LINDEMANN, Respondent, v. SAN JOAQUIN COTTON OIL COMPANY (a Corporation) et al., Appellants.

484

Harry D. Parker, Raymond G. Stanbury, Parker & Stanbury, Walter S. Coen and Chester O. Hansen for Appellants.

Kidd, Schell & Delamer, Francis J. Gabel, J. Hampton Hoge, A. Dal. Thomson, Hugh B. Rotchford, Nourse, Betts & Jones, Joseph A. Spray, A. W. Ashburn, Horace W. Danforth, George L. Greer, Joe Crider, Jr., Bronson, Bronson & Slaven, Daniel W. Burbank, C. F. Laumeister, Sidney L. Weinstock, Cooley, Crowley & Supple, Hadsell, Sweet, Ingalls & Lamb, O'Connor, Fitzgerald & Moran, Redman, Alexander & Bacon, H. W. B. Smith, Jesse H. Steinhart and John J. Goldberg, as *Amici Curiae* on Behalf of Appellants.

C. Ray Robinson and James D. Garibaldi for Respondent.

Walter J. Little, as *Amicus Curiae* on Behalf of Respondent.

SEAWELL, J.—We herewith adopt as a part of our opinion the opinion of the District Court of Appeal, Third Appellate District, by Pullen, P. J., except that portion which holds that the judgment is not excessive. The question of excessive damages is disposed of by our views, which immediately follow the adopted portions of the District Court of Appeal opinion. The opinion of the District Court of Appeal follows first in order:

"Respondent herein as plaintiff recovered a judgment in the sum of $62,500 based upon a verdict by a jury in that amount against San Joaquin Cotton Oil Company, a corporation, and Thomas Ewing, its district manager, for personal injuries sustained while riding as a guest of defendant Ewing, in a car owned by San Joaquin Cotton Oil Company. These defendants appeal both from the judgment and from an order denying their motion for judgment notwithstanding the verdict.

"As grounds for reversal appellants urge that the evidence is insufficient to support the verdict in that plaintiff was guilty of contributory negligence which proximately contributed to his injuries; that the verdict was excessive; that the court erred in its instructions to the jury upon the subject of damages; that the jury were guilty of prejudicial misconduct, as was also the attorney for the plaintiff, and that the evidence was insufficient to support the implied finding that defendant Ewing was acting as agent for the Oil Company at the time of the accident.

"In the following recital of the facts as gathered from the evidence this court will in accordance with the well-established rule, concern itself only with those facts, and inferences therefrom, that tend to establish the correctness of the findings of the jury.

"It appears that plaintiff was a farmer in the San Joaquin valley, allotting a large acreage of his lands to the production of cotton. Defendant San Joaquin Cotton Oil Company operated a number of cotton gins throughout the valley, and was heavily involved, financially, in aiding the growers in its territory, including plaintiff, to produce and market their cotton crops.

"About April 22d or 23d, 1933, defendant Ewing called plaintiff on the telephone and informed him that an important meeting of the San Joaquin Agricultural Labor Bureau was to be held in Fresno on April 24th, and urged him to come and bring with him as many of the representative farmers from his neighborhood as he could. Plaintiff accepted the invitation and went to Fresno with Mr. Harry Fawcett, a neighbor. The meeting was held in the afternoon and was over by 4:30 p. m. After the meeting adjourned some informal discussion took place in the lobby of the Californian hotel, where the meeting had been held, after which a group includ-

ing plaintiff and defendant Ewing, adjourned about six o'clock to some place several blocks from the hotel where liquor was obtainable. Both plaintiff and defendant each had a bottle or two of beer and four or five highballs. While there, Mr. Fawcett having another engagement, left, Ewing inviting plaintiff to remain and he would take him home. Plaintiff accepted the invitation of Ewing stating that he wanted to talk to him and get his advice on certain matters pertaining to his cotton crop. About eight o'clock plaintiff and Ewing left the resort and went to a restaurant near the hotel where they had dinner. No drinks were had after they left the liquor establishment. About nine o'clock they got into Mr. Ewing's car, he driving, plaintiff to go to his home in Los Banos, Ewing to Chowchilla. Apparently nothing unusual occurred until they had reached a point somewhere near Madera, whether to the south or north thereof is not entirely clear. Plaintiff stated at one place in his testimony it was between Madera and Califa that Ewing was trying to see how fast his new Ford would go and plaintiff then said to him: 'Don't let's be in a hurry, we don't have to be.' Apparently the driver then slowed down, but subsequently on several other occasions plaintiff asked Ewing to drive more slowly, which apparently he did. In the meantime they were discussing finances pertaining to plaintiff's cotton crop and other matters affecting their mutual business interests. When they reached a point near Chowchilla, where the highway to Los Banos leaves the main highway, plaintiff suggested to Ewing that he would accompany Ewing to Chowchilla and would then drive from there to Los Banos alone and return the car the following day. To this Ewing would not agree, and they continued on toward Los Banos. Plaintiff again warned Ewing two or three times about driving too fast and he slowed down. At the time of the accident, which occurred about 10:30 or 11 o'clock in the evening, Ewing was driving along a main paved county highway eighteen feet in width, at a rate of approximately 45 to 50 miles an hour on the straightaways, slowing down to about 30 miles an hour as he approached the bridge where the accident occurred. Just a very few minutes prior to the accident plaintiff had closed his eyes although he was not asleep. On several occasions plaintiff warned Ewing about driving at an

excessive rate of speed, and was asked: 'After you warned him did he slow down,' to which he answered, 'He was then slowing down some with his driving so I was not worried about it any more.' Then, owing to the blinding headlights of an oncoming car, as claimed by Ewing, he swung too far to the right and struck the bulkhead of a small bridge, causing the injuries of which complaint is here made.

"Not only by the finding of the jury, but by the plea of contributory negligence is it determined that at the time of the accident, the companion of plaintiff was intoxicated. This was not a case, however, of an intoxicated driver who proclaimed that fact abroad by boisterous, erratic or maudlin speech or action. Defendant Ewing denied he was intoxicated at any time during the day or evening in question. Plaintiff was asked, if in his opinion Ewing was intoxicated at the time he got into Ewing's car to go home, and he replied: 'Not what I would call intoxicated,—maybe talking a little bit louder,—we just felt the drinks we had.'

"Dr. Lum, a witness called by the plaintiff, testified in regard to the intoxication of Ewing, upon cross-examination as follows: 'Q. You had no difficulty in determining that Mr. Ewing was intoxicated, did you? A. Yes I did; he was not dead drunk; his speech was pretty good; his first concern manifested was for the injured man, but the appearance of abnormality made me think so; I think that the alcohol had probably altered or slowed his reaction to such an extent that it would come within the limit of the definition as given by the Judge. Q. By that you mean, Doctor, away within the limits, or just the border line? A. It would not be away within the limits, I would say fairly definite within the limits. Q. In other words, it was so much so that you had no difficulty in arriving at that conclusion? A. I did have difficulty, yes, that is because of the definition of intoxication, there are so many definitions and it was largely a question of definition whether or not it would arrive within that definition.'

"During the journey they discussed business and crop conditions, plaintiff testifying he had extensive acreage and a very heavy loan from the Oil Company which required close attention both on his part and on the part of the Oil Company which was financing him.

"With these general facts before us appellants ask this court to declare that under the circumstances plaintiff was guilty of contributory negligence in riding with Ewing, as a matter of law. However, we would not be justified in so holding nor does the law assume that responsibility in face of the evidence and the finding by the jury in favor of plaintiff.

"As was stated in *Smalley* v. *Southern Pac. Co.*, 212 Cal. 540 [299 Pac. 529, 538] : 'Contributory negligence is a question of law only when the court is impelled to say that from the facts reasonable men can draw but one inference pointing unerringly to the negligence of the plaintiff contributing to the injury. . . . In all other cases the question of contributory negligence is a question of fact for the jury.'

"So it was here for the jury to determine whether or not Ewing was intoxicated, whether that fact was known to plaintiff, and if known, when he became aware of that fact, and what should he as a reasonable man, have then done under the circumstances; also, whether the intoxication of the driver proximately contributed to the accident.

"Appellants have filed a carefully prepared brief setting forth numerous authorities in support of their contention that plaintiff was guilty of contributory negligence but we do not believe the cited cases sustain their contention. In *Jones* v. *Pacific Gas & Electric Co.*, 104 Cal. App. 47 [285 Pac. 709], plaintiff was riding as a guest with one Cottrell and was injured when the automobile collided with a pole belonging to Pacific Gas & Electric Company. Judgment was entered in favor of the power company. The plaintiff appealed from that judgment which was affirmed, the court holding in effect that the evidence as to intoxication sustained the finding of the jury. The court said: 'From what the testimony shows as to the carousing of the party the jury was warranted in drawing the inference, that the defendant Cottrell was seeing lights where there were none,' and ' . . . what we have set forth is amply sufficient to justify the jury in coming to the conclusion that all of the men, at least, were under the influence of intoxicating liquor. . . . '

"In *Hirsch* v. *D'Autremont*, 133 Cal. 106 [23 Pac. (2d) 1066], plaintiff was a guest of defendant in his automobile, going from Los Angeles to Santa Ana. The plaintiff was in-

jured and sued her host. A verdict was returned by the jury in favor of plaintiff, but a judgment notwithstanding the verdict was entered by the court from which plaintiff appealed.

"In its opinion the court clearly indicated that it was only after a clear case of intoxication had been manifested, and that thereafter plaintiff had had an opportunity to withdraw from the car at a well-lighted service station where she could have communicated with her friends by telephone, that she was as a matter of law held to be guilty of contributory negligence, the court saying: 'The evidence is conflicting as to whether Word was or was not under the influence of liquor when the party left Los Angeles and as to whether or not such fact was known to plaintiff, and the question whether or not she was guilty of contributory negligence in commencing to ride to Santa Ana was clearly for the jury. We are also of the opinion that the question as to whether or not plaintiff should have left the car when it stopped at the railroad crossing to let the freight train pass, considering that it was among orange groves and in the middle of the night, even though she then knew that the driver was under the influence of intoxicating liquor, is one upon which reasonable men might well differ and was in consequence one for the jury to determine.'

"The same rule was applied in the case of *Connor* v. *Johnson*, 132 Cal. App. 449 [22 Pac. (2d) 760]. In *Whitsett* v. *Morton*, 138 Cal. App. 628 [33 Pac. (2d) 54], this court analyzed the evidence, determining it was sufficient to support the verdict of the jury, as was the situation also in the case of *Lynn* v. *Goodwin*, 170 Cal. 112 [148 Pac. 927, L. R. A. 1915E, 588]. Appellants suggest that the case of *Tomlinson* v. *Kiramidjian*, 133 Cal. App. 418 [24 Pac. (2d) 559], relied upon by plaintiff, can be distinguished from the case at bar in that in that case there was a cause of action for gross negligence as well as intoxication, whereas in the instant case plaintiff relied entirely upon intoxication, but a reading of that case seems to clearly indicate that the controlling question in the mind of the court was that of intoxication. It was there said:

" 'From these facts we feel that it was a question for the jury to determine, under proper instructions, (a) whether the defendant Christian was drunk or under the influence of

intoxicating liquor as defined in *People* v. *Ekstromer*, 71 Cal.
App. 239, 246 [235 Pac. 69], and whether, if drunk, or un-
der the influence of intoxicating liquor, that this was the
proximate cause of the accident, (b) whether the deceased
knew, or should have known, that defendant Christian was
under the influence of intoxicating liquor when he last started
to ride with him, and (c) whether the turning to wave at the
passengers of the passing automobile while traveling at an
excessive rate of speed was gross negligence, and whether such
gross negligence, if so found, was the proximate cause of the
accident. (*Krause* v. *Rarity*, 210 Cal. 644–655 [293 Pac. 62,
77 A. L. R. 1327].) From the evidence that a person had
been drinking intoxicating liquor and thereafter drives his
car in a negligent manner, it does not follow as a matter of
law that he was driving while under the influence of intoxicat-
ing liquor. There is no evidence in the record from which it
can be said as a matter of law that deceased knew, or should
have known, that Christian was under the influence of in-
toxicating liquor before he entered the automobile the last
time, or that after discovering his intoxicated condition he
had a clear chance to leave the automobile at a safe place.
This clearly distinguishes the present case from *Hirsch* v.
*D'Autremont*, 133 Cal. App. 106 [23 Pac. (2d) 1066].' Also
whether the factor of contributory negligence arose by reason
of the intoxication or of the recklessness of the driver would
make no difference in the application of the rule. Many
other cases are cited to the same effect but sufficient has
been said to indicate that the rule undoubtedly is that where
the minds of reasonable men might differ, it is our province
only to find whether or not there is sufficient evidence in the
record to support the finding of the jury, the burden resting
upon them to determine the disputed question of fact.

. . . . . . . . . . .

"At the time of the accident respondent was an able-bodied
man forty-two years of age with a life expectancy of 26.7
years, supporting and caring for his wife and minor son. For
many years he had carried on extensive farming operations
and at the time of the accident was operating some 4500
acres of land, 1500 acres of which had been set aside for the
growing of cotton, and approximately 3000 acres of land
planted to grain. The net income from the grain land that

year was approximately $20,000. We gather from the record that the accident interfered with the production of a cotton crop that year.

"The accident occurred on April 24, 1933, and plaintiff remained in the hospital until May 21st, when he was removed to his home where he remained in bed under the care of nurses for approximately a month longer, when he was able to be about, but owing to his nervous condition his physician advised an ocean voyage which he took and which extended from November 6th to December 22d. At the date of the trial in March, 1934, plaintiff testified that although his nervous condition was improved he still became agitated and excited over small matters and was unable to attend to his affairs or transact any actual business, a condition verified by the testimony of the doctors.

"To enumerate except in the most general way the injuries sustained would unduly extend this opinion and encumber it with many technical terms, unintelligible except to a specialist. However, Dr. Lum, his attending physician, described fractures of the skull, fractures of the jaw, one of the fractures of the lower jaw going down through the first molar, severing it, and continuing through the mandible, fracturing off part of the alveolar process, fractures which caused a portion of the jaw to drop out of alignment, a fracture and separation of the frontal and nasal bones, a fracture extending into the left orbit and a fracture of the palate radiating back through the right antrim and into the floor of the frontal vault. Also a concussion of the brain and probably lacerations of the brain tissue and brain damage. Such injuries, Dr. Lum testified, cause hemorrhage in the brain and in healing leave scars in that area interrupting the normal functions of the patient. Also there were multiple contusions about the body, a median nerve injury on the left hand causing a vandegriff or talon hand. In the chest there was a fracture of the seventh and eighth costal cartilages. As to the brain damage Dr. Lum was asked as to the probable effect of that injury and testified that such a severe injury could alter one's personality, making him less stable and occasionally developed a preliminary epilepsy, due to increased unstable brain substance. As to what to expect with reasonable certainty there were many things the doctor said could happen.

Although the various fractures and contusions had healed the brain injury and the median nerve injury are permanent. The doctor also testified there was not a complete paralysis of the legs, and plaintiff's general facial appearance was altered, the chin forced back and there was a sag in the face. His nervous condition also was unstable and he would never be able to do the physical work he did prior to the accident.

"Dr. Sutton, a dentist, testified as to the injuries and repairs to the mouth and teeth, consisting of a compound fracture of the jaw, the splitting and breaking of the teeth and injury to the nerves of the teeth and the correctional methods used. The doctor, when asked as to the pain and suffering caused by the appliances required to repair the damage said, 'Well, I would say it was just awful,' and that one particularly severe appliance remained in place for about six weeks. Dr. Sutton also testified that plaintiff would require practically a complete set of upper and lower artificial teeth. Dr. Fountain who cooperated with Dr. Lum and Dr. Sutton, corroborated them in what was done and the effect upon the patient. Dr. McDowell, a specialist of the eye, ear, nose and throat, testified he treated plaintiff after the accident and found his eyesight impaired and prescribed the wearing of glasses. An examination of the hearing of plaintiff disclosed that that sense was approximately 30 per cent deficient.

. . . . . . . . .

"Appellants criticize an instruction upon the measure of damages submitted by plaintiff and given by the court. The instruction as given reads:

" 'If you find that the plaintiff is entitled to recovery, the measure of his recovery is what is denominated as compensatory damages, that is, such sum as will compensate him for the injuries, if any, he has sustained.

" 'The elements entering into this damage are as follows:

" '1. Such sum as will compensate him for the expense, if any, that he has reasonably and necessarily incurred for medical and hospital aid and assistance, not exceeding the amount alleged in the complaint for this purpose, to-wit: $2,265.25.

" '2. Such sum as will compensate him for the expenses, if any, it is reasonably certain he must reasonably and neces-

sarily incur, if any, for medical aid, hospital expenses and nursing in the future, because of such injuries.

" '3. The value of his time, if any, during the period he has been disabled by the injury.

" '4. If the plaintiff's power to earn money in the future has been impaired by the injuries, if any, such sum as will compensate him for such loss of power, if any.

" '5. Such reasonable sum as the jury may award for physical pain and mental anguish suffered, if any, or reasonably certain to be suffered in the future, from the injuries, if any.

" 'The first three of these elements are the subject of direct proof and are to be determined by you upon the evidence you have before you, the last two elements are from necessity left to the sound discretion of the jury, but in any event the damages must be just, and cannot exceed the amount alleged in the complaint, to-wit: $127,265.25.'

"Appellants criticise the last paragraph of this instruction in that the jurors were instructed to determine the loss of earnings of plaintiff, if any, upon direct proof, whereas there was no evidence of any kind introduced as to the value of plaintiff's time while disabled, or to his earning power. The following is the evidence adduced upon the question of earnings:

" 'Q. Mr. Lindemann, referring to the question of your loss of earnings will you state whether or not it is true that last year off your grain crop, off of the land that was harvested after this accident, that you made a net profit of about $20,000? A. Approximately so. Q. That was off your grain land was it not? A. Yes, sir. Q. Is it or is it not true that since the accident and at the present time you have under cultivation some 300 or 400 more acres than you had last year? A. Yes sir.'

"Plaintiff also testified that as a farmer prior to his injuries he personally took charge of his tractors and farming implements, making the necessary repairs and doing the actual work but since that time he gets agitated and cannot attend to business so far as the physical requirements are concerned, is unable to use his crippled hand, cannot walk enough, nor operate a car as he once did, and at the time of the trial was able to carry on no actual business.

"The objections urged by appellant to the instruction are very similar to those urged to an almost identical instruction given in *Storrs* v. *Los Angeles Traction Co.*, 134 Cal. 91 [66 Pac. 72], which received the approval of the Supreme Court in a well-considered opinion delivered by Mr. Justice Harrison. To quote all of the pertinent parts therefrom would extend this opinion unduly, but reference is made thereto for a complete answer to the contention of appellants.

"Appellants attempt to distinguish that case or lighten its effect as precedent to the instant case, but we think without avail. The court there said:

" 'The objection of the appellant, that, as there was no specific testimony that the plaintiff was earning anything at the time of the injury, or of the amount that he was capable of earning, any verdict of the jury under this instruction would be merely conjecture, is untenable. . . . The fact that he was not in the receipt of any salary or wages, but was attending to his own business, does not deprive him of right to compensation for the loss of his earning capacity, since it is what he was capable of earning, rather than what he was actually earning, that was to be considered by the jury. It may be conceded that in the absence of all evidence tending in any respect to show an impairment of his earning capacity, the jury would not have been authorized to include any compensation therefor in their verdict, but it does not follow that it was necessary that there should be direct or specific testimony that he was in the actual receipt of wages, or capable of earning a specific sum in any particular employment. . . . If the circumstances which were before the jury show that by reason of the injury he has become unable to perform the labor or transact the business which he was accustomed to transact or perform prior thereto, he is entitled to recover damages therefor, and from the nature of the investigation the amount of such recovery must be left to the wise discretion of the jury. It needs no evidence to show that a plaintiff in full health and vigor, who has lost an arm or a hand by reason of the negligence of the defendant, has had his earning power greatly impaired, and in such a case a jury would not be limited to nominal damages, although there should be no evidence that he was in the receipt of wages at the time of the injury, but would be authorized to give sub-

stantial damages. (*Chicago etc. R. R. Co.* v. *Warner*, 108 Ill. 538; *Fisher* v. *Jansen*, 128 Ill. 549 [21 N. E. 598]; *District of Columbia* v. *Woodbury*, 136 U. S. 450 [10 Sup. Ct. 990, 34 L. Ed. 472]; *Gainesville etc. Ry. Co.* v. *Lacy*, 86 Tex. 244 [24 S. W. 269]; *Missouri etc. Ry. Co.* v. *Vance*, (Tex. Civ. App.) 41 S. W. 167.) The rule for measuring damages is, however, the same, whatever may be the extent of the injury, but the measure of damages in any particular case will depend upon the facts in that case. No testimony is required upon matters which are presumably within the knowledge or observation of all men of common intelligence. ''Juries are in many cases permitted to exercise their own individual judgments as to values, upon subjects presumptively within their own knowledge, which they have acquired through experience or observation, and the objection that no evidence was presented before them upon such subjects is insufficient to defeat their verdict.'' (*Cederberg* v. *Robison*, 100 Cal. 93 [34 Pac. 625].)'

''This case has been cited with approval and the principles there stated applied in the cases of *Girard* v. *Irvine*, 97 Cal. App. 377 [275 Pac. 840]; *Campbell* v. *Bradley*, 179 Cal. 364 [176 Pac. 685]; *Holmes* v. *California Crushed Fruit Co.*, 69 Cal. App. 779 [232 Pac. 178].

██ ''Appellants also urge misconduct of a juror as a ground for reversal. The record shows that a juror when asked upon her *voir dire* if she knew or was acquainted with plaintiff, or if she knew of plaintiff, by her silence indicated a negative answer.

''By affidavits, one from the wife of defendant Ewing, appellants attempt to show a friendly greeting by the juror to the wife of plaintiff during an intermission in the course of the trial, and three from fellow jurors as to statements made in the jury room during their deliberations by the juror that plaintiff was changed in facial expression and disposition since the accident.

''Counteraffidavits were filed by plaintiff, by the juror under attack, and by certain other jurors denying the allegations. These conflicting affidavits were before the trial court upon the motion for a new trial, and the finding there made is binding upon us. ██ A new trial may be granted upon the ground a juror made untrue answers to questions asked

upon his *voir dire,* if it appears the moving party was not aware of the falsity at the time of the completion of the impanelment of the jury, and did not discover such fact during the trial and before the rendition of ·the verdict. (20 Cal. Jur., p. 54.) It appears from the affidavit of Mrs. Ewing that the circumstances related by her were alleged to have occurred at the noon recess of the first day of the trial and by the affidavits of counsel for defendants it appears they were made acquainted with the facts set forth in the affidavit almost immediately and before court was convened that same day, called the matter to the attention of the trial judge but did nothing further in the premises. In *Sherwin* v. *Southern Pacific Co.,* 168 Cal. 722 [145 Pac. 92], the court said, in a similar situation: 'If the defendant or its attorneys had discovered these facts at any time during the trial it would have been their duty, if they desired to take advantage thereof, to apply to the court for leave to reopen the examination of the jurors, elicit the facts, and thereupon offer a challenge to the juror guilty of misconduct.' It would obviously be improper to permit a party knowing of misconduct to withhold action and gamble on the outcome before making complaint. We cite the foregoing as an additional reason for upholding the action of the trial court in denying a new trial on the ground of misconduct of the jury.

"As to the alleged misconduct of the attorney for plaintiff, we cannot find sufficient ground for a reversal. The alert and able counsel for appellants have emphasized the statements of counsel for plaintiff wherein he apparently went outside the record, but we cannot attach to these matters the importance that appellants do nor can we believe the jury were influenced thereby, particularly in view of the admonition of the court.

"The last point to be considered is the claim that the evidence was insufficient to support the implied finding that Ewing was acting as an agent of San Joaquin Cotton Oil Company at the time of the accident. The following facts are in evidence: Ewing was the district manager of defendant San Joaquin Cotton Oil Company, with headquarters at Chowchilla, and whose territory covered the San Joaquin valley north of Fresno. Among his other duties were to solicit business from the farmers in that territory, settle ac-

counts, arrange budgets and other details in connection with loans, and advise and counsel as to the production and sale of cotton. He had no fixed hours but was on duty practically twenty-four hours a day. He also did a certain amount of contact and public relationship work as between his company and the farmers, creating and maintaining a friendly relationship between the company and the community.

''The car involved in the accident belonged to the company, who paid for the gas and oil, except when the car was being used for the private business of Ewing, and there is no evidence that on this trip Ewing paid for any gas or oil. Plaintiff attended the meeting upon the invitation and solicitation of Ewing. This meeting was of the San Joaquin Valley Agricultural Labor Bureau, meeting for the purpose of fixing the general price for labor in cotton production for the approaching season, at which meeting Ewing was attending as a part of his duty as manager of the Cotton Company, and it was a part of his duty to see that the growers the company was financing attended these meetings. At the gathering after the meeting and before dinner it will be recalled that Mr. Fawcett with whom plaintiff came to the meeting, stated he was leaving, and plaintiff was preparing to accompany him when Ewing said to plaintiff he had no special reason to go home and offered to take him home later, to which plaintiff replied he would accept the invitation as 'he wanted to talk and get some advice from him'.

''After dinner the two men, plaintiff and defendant Ewing, got in Ewing's car, Ewing driving, and they proceeded toward Los Banos, the home of plaintiff. Ewing admits they discussed plaintiff's business during the trip and almost up to the time of the accident. Plaintiff testified he already had a heavy loan with the Cotton Company and had an extensive acreage under cultivation and an additional loan was necessary to cut weeds. Hence the need of a discussion between plaintiff and Ewing.

''It seems to be the contention of appellants that when Ewing deviated from the main highway at Califa, there taking the road leading from the main highway to Los Banos, he then abandoned the business of his employer and embarked upon a matter of his own business or pleasure. But here we have a customer of appellant whose financial interests

were closely interwoven with the Oil Company, attending a meeting upon the invitation and solicitation of Ewing, a manager of the company. Ewing was anxious undoubtedly, to retain plaintiff's cooperation, and in his capacity as ambassador of good will, keeping up his contacts and developing cordial relations between plaintiff and defendant, was impelled to make a sixty-mile detour not on account of any close personal friendship between himself and plaintiff but to advance the interests of his employer. We believe the facts and circumstances here show that the entire journey was on the mission of his employer, and the jury were justified in so finding.''

Because of the united insistence that the trial court committed serious errors of law which were sanctioned by the District Court's decision, and the somewhat fearsome tenor as to the result of the decision as expressed in the briefs filed by petitioners and a score of *amici curiae* for a hearing in a cause which affords a prolific field for diversified views, particularly as to whether defendant Ewing was, at the time of and immediately prior to the accident, in a fit condition to drive said automobile, and if not, whether his unfitness was so clearly apparent that an ordinary reasonable person in plaintiff's situation, in all the circumstances of the case, should have known of such unfitness, thereby barring his right to recover damages on the ground that plaintiff was guilty of contributory negligence and the driver's intoxication, by reason of that fact, was not the proximate cause of the injury or damage suffered by him, we were moved to grant the petition for hearing.

The defendants answered separately. Defendant Ewing's answer was verified by his attorney, Harry D. Parker, Esq.

San Joaquin Cotton Oil Company did not tender intoxication or any other issue as a defense to the action on the claim that plaintiff was guilty of contributory negligence. Defendant Ewing, by his answer verified by his attorney, did tender the issue in the most general terms. If he was not intoxicated, as it was repeatedly insisted both by answer and by his testimony that he was not, plaintiff could not possibly have been guilty of contributory negligence. His testimony, in accounting for the accident, was that he was blinded by the lights of an approaching truck or car, and he accounted for

the accident on this theory and did not in any way suggest that plaintiff's presence in the car even remotely contributed to the accident.

San Joaquin Cotton Oil Company by its answer denied that plaintiff was riding as a guest with defendant Ewing, admitted that he was an occupant of the automobile operated by Ewing, but did not allege the nature of his occupancy. It denied that Ewing was intoxicated or was under the influence of intoxicating liquor; admitted that said automobile was wrecked but denied that it was operated in a careless or negligent manner, and denied for want of information and belief that plaintiff was injured at all. As an affirmative defense, it alleged upon information and belief that at the time of the accident plaintiff and defendant Ewing were engaged in the prosecution of a certain business in which they had a joint and common interest. Said company alleged that said accident was unavoidable and occurred without any fault on the part of said company. It admitted that said Ewing was an employee of said company but denied that at the time of the accident he was an agent of said company or that he was then acting in the course and scope of his employment. All other allegations were denied for lack of information and belief.

Defendant Ewing, through his attorney, repeatedly denied that Ewing was under the influence of intoxicating liquor or that his condition in that respect contributed to the accident in any degree. Said answer denied on information and belief that plaintiff was injured in the manner alleged or at all. It affirmatively alleged that *if any* accident occurred, it was the result of unavoidable circumstances. Practically all of the other material allegations, many of which were unquestionably within the personal knowledge of Ewing and could not have been denied by him, were denied by the attorney for want of information and belief.

For the reason that the subject has to do with the answer filed by Mr. Ewing, we will at this point dispose of the assignments of misconduct charged against plaintiff's counsel on account of certain questions asked of defendant Ewing, who was called under section 2055, Code of Civil Procedure, as to his relations and acquaintance with the attorney who had drawn and verified an answer on his behalf. The exami-

nation was germane to the denials and allegations set forth in the answer. The witness was asked if he had ever before trial seen the attorney who verified the answer on file and he replied that he never had. Counsel then proceeded to ask the witness if he knew who he was and whether he had had any correspondence with the person who had verified his answer, and the court sustained objections to these and any further questions relating to the subject. We think it was perfectly proper for the plaintiff to show whether the denials and the allegations of the answer were predicated upon any information furnished by Ewing or were blindly made without consulting him. Many of the allegations denied for lack of information and belief were directed to matters that were unquestionably within the personal knowledge of Ewing and they could not have been truthfully denied by him.

 A verified answer, filed in an action, is presumed to contain facts which from the nature of the matter under investigation are within the knowledge or belief of the adversary party, whether they be in the form of denials or affirmative allegations. Where a defendant, as here, is the actor and is in possession of all of the main facts, goes to trial on a complaint verified by another person who has no personal knowledge of the facts which are alone within the breasts of the plaintiff and the defendant, he thereby stands upon and sponsors such an answer, and he may not avoid the effect of an examination which requires him to explain why he stands upon denials and allegations which he could not have truthfully subscribed to. The questions which were assigned as misconduct were properly the subject of inquiry in the face of the many denials and allegations made on information and belief and which could not have been made by defendant Ewing. No misconduct is shown by the assignments. The other assignments of misconduct are too unsubstantial to require special mention. Moreover, the court fully advised the jury as to statements made by counsel not supported by evidence.

 The legal batteries of all of the petitioners and *amici curiae* are leveled upon the primary question, to wit, does the evidence as a matter of law convict plaintiff of contributory negligence? The burden of proving contributory negligence rested upon the defendants.

There is no merit in the suggestion or contention that the evidence which tended to establish the intoxication of defendant Ewing to the degree which would render him liable for the injuries and damages suffered by reason of the accident is necessarily conclusive of the question as to whether plaintiff had or should have had knowledge that Ewing was so far affected by intoxicating liquor as to defeat his claim for damages. If that is true, then every person riding as a guest would be defeated by proof of the single fact that the driver was not in a fit condition to drive the automobile. The question upon which liability depends is whether the plaintiff knew or should have known that defendant Ewing was not in a fit condition to drive his car on the occasion of the accident. ▮ In deciding questions of this character it is the duty of the triers of fact to place themselves in the position that the plaintiff was in, as shown by the evidence, and to give proper consideration to the things and matters which form the basis of, or ordinarily affect or influence the judgment of men engaged in the ordinary affairs of life. Judgments formed upon what apparently appears to be the true relation of things often prove to have been erroneously formed. If, however, the circumstances were such as to justify a reasonable man in acting upon them, he will not be deprived of a remedy which the law provides if it afterward is proven that his judgment was fallaciously formed. ▮ The rule therefore is, what would a reasonable person have done in plaintiff's position, seeing what he saw, knowing what he knew in the light of the circumstances of his situation, and affected by the human propensities or elements which ordinarily enter into the formation of and influence the judgment.

No prejudice by reason of the fact that either or both of the parties involved in the accident had partaken of intoxicants should cause a court, where a legal right is involved, to consider lightly the rights of said parties, even though their unhappy plight may have been brought about by conduct which may appear to be highly censurable.

With the foregoing rules as guides, we will briefly, in addition to what has been said by the District Court of Appeal, add our concurrence to the views of the trial court and the District Court of Appeal in support of the conclusion that there exist grounds upon which the judgment may be affirmed.

Both parties to the accident are men prominent in the agricultural and business life of the communities in which they reside. Mr. Ewing was the manager of a large financial corporation which financed and advised with the cotton growers in planting, harvesting and marketing their crops. He was therefore a man in whose judgment the cotton growers must have had confidence. Mr. Lindemann was a prominent cotton grower and grain farmer, operating 1500 acres of cotton and approximately 3,000 acres of grain. That he was an influential and well-known citizen of the San Joaquin Valley is made clear by the fact that Mr. Ewing requested him to attend the meeting which he had arranged and to bring with him others engaged in cotton growing. The meeting was called by Mr. Ewing to discuss with them problems of the cotton growers. Mr. Lindemann was indebted to the company in a large sum and was negotiating for another advancement to be used in clearing his lands of weeds. That the San Joaquin Cotton Oil Company exercised a supervisory control over the growers whom it financed there is no room to doubt. He, accompanied by Mr. Fawcett, a neighboring cotton grower, went to the Californian Hotel, the place of meeting, as Ewing's guest. The meeting opened at 2 o'clock P. M. and adjourned at 4:30 P. M. After adjournment a number of those present spent some thirty minutes at the hall engaging in conversation. Someone suggested that the party, consisting of Mr. Lindemann, Mr. Steintorf, Mr. Fawcett and Mr. Ewing go to a place some four or five blocks from the hotel where intoxicating liquor was sold. Evidently the suggestion did not come from Lindemann. Mr. Ewing seemed to be better acquainted with the location of the places which served refreshments than the others. At said place Mr. Fawcett drank several bottles of 3.2 per cent beer, and Mr. Ewing and Mr. Lindemann each drank two bottles of beer and four whisky highballs. Mr. Fawcett had an appointment and left the place at approximately 7 o'clock P. M. Mr. Lindemann, at the insistence of Mr. Ewing, consented to ride home with him, as both lived in the same general direction and they wished to discuss business matters relative to Lindemann's crop problems. Ewing was anxious for him to remain and ride with him. Mr. Ewing and Lindemann returned to Mr. Ewing's automobile and were driven to an eating place known as ''Tiny's Waffle Shop'', where both ate a beefsteak

or mutton chops and had coffee. No liquor was consumed with the meal nor carried by them. The homeward journey began at about 9 o'clock P. M. The evidence would undoubtedly sustain a finding that Mr. Lindemann was at no time affected with intoxicating liquor during the journey home. Both he and Mr. Ewing had drunk exactly the same kind and quantity of beverages during their stay at the place of purchase, to wit, two bottles of beer each and four or five highballs during a period of three hours, after which they ate a meal. All of the evidence is to the effect that Lindemann was not at any time perceptibly affected by what he had taken. Mr. Ewing was, no doubt, the dominant personage by reason of the responsible and commanding position which he held as manager of the financial institution to which Lindemann was indebted and from which he expected to obtain other advancements through the recommendation of Mr. Ewing. It would seem to be the natural thing for him to rely to some extent upon the assurance that a man of his type would not undertake to drive a car unless he was able to do so in safety to himself and others. He had on several previous occasions ridden with Mr. Ewing. It is true that he related circumstances which occurred on the journey homeward that would indicate that at times he had misgivings as to whether Mr. Ewing was in a fit condition to drive the car. Mr. Ewing testified that he was not affected with intoxicating liquor and that an oncoming motor vehicle occupied the center of the narrow bridge, and in an attempt to avoid a head-on collision he struck the right-hand abutment of the bridge.

Petitioners zealously contend that the same evidence which impliedly established Ewing's intoxication also inextricably enmeshed Lindemann in its skeins, and notwithstanding the fact that the jury impliedly found that he was not guilty of contributory negligence, its implied finding is so entirely lacking in evidentiary support as to render such finding error as a matter of law. The intoxication of Ewing and Lindemann's knowledge of that fact were two distinct issues submitted to the triers of the facts.

Subject to the exercise of legal discretion, the jury is the sole judge of the weight, effect and sufficiency of the evidence to establish any fact for which it may be offered. The jury is the sole judge of the credibility of the witnesses and may believe all of the testimony of a witness or believe a

part and reject parts as it may be convinced of the truth or falsity of such testimony, whether it arises from wilfulness or mistake. It is its duty to reconcile conflicting evidence where it is possible to do so, and its findings cannot be set aside by the court unless they are found to be without support upon a full consideration of the whole case. So, here, we must consider the evidence in its most favorable aspect to the end that the judgment may be sustained.

Mr. Lindemann testified that at the dinner table Mr. Ewing showed no signs of intoxication; that there was nothing unusual about his conversation; that the first time that he showed any signs of being affected with the use of intoxicants was after they had passed through Madera, which is twenty-two miles north of Fresno; that his opinion was largely based upon his insistence to show Mr. Lindemann the speed of the company's relatively new car. He was driving faster than Mr. Lindemann cared to ride and he said to him, ''Don't let us be in too much of a hurry.'' Mr. Lindemann further testified, in response to questioning, that he *believed*, ''at the time when this accident happened'', that Mr. Ewing was under the influence of intoxicating liquor. The following question put to Mr. Lindemann had a tendency to fix the time when he first formed the opinion that Mr. Ewing was affected by liquor:

''Q. Now you can answer this question yes or no. Did you say that *just before* this accident happened Mr. Ewing was under the influence of liquor? A. I do.'' (Italics ours.) At another time he stated that it was ''right around after we had left Fresno that he showed any signs of it''. The drive from Fresno to Madera should not exceed thirty to thirty-five minutes. There was no suspicion in the mind of Lindemann as to Ewing's sobriety when he entered the car. His inclination to show Lindemann the speed of the car, which he would reduce at the suggestions of or on objections made by Mr. Lindemann but in a few minutes thereafter would again drive faster than Lindemann cared to ride, was not of itself sufficient to establish intoxication. Ewing's testimony is that he drove at a speed of 45 or 50 miles per hour. Mr. Lindemann gave testimony to the effect that he did not speak to Ewing about ''taking it easy'' until they had passed Madera, which was the only stopping place on the road. In fact, all of the several suggestions made by Lindemann as to speed were made between Madera and Califa, a distance of eleven miles. Califa

is a mere sign placed on the highway and indicates the point where the road known as Pacheco Pass leads westerly from the Golden State highway. It is not even a settlement or village. Lindemann said that he had reminded Ewing a few minutes before the accident occurred that they were in no hurry and to "take it easy", and Ewing slowed down the speed, and he was not "worried about it then". He temporarily closed his eyes, as he had done before on the journey, when the accident happened. Ewing testified that immediately before striking the abutment the speed of the car was thirty miles per hour. Lindemann further testified that they discussed matters bearing on his indebtedness to the company and his crop problems practically throughout the entire journey. Ewing may have talked a little louder than usual, "but nothing out of the ordinary"; he did not talk like an intoxicated man. It cannot be said with certainty that the testimony of Lindemann alone, without the testimony of Dr. Lum and Mr. Fawcett, which will hereafter be noticed—the burden being upon him—would have been deemed by the jury as sufficient to convict him of intoxication during the fifty-five mile drive. The jury may have considered that the tendency to speed was not an uncommon occurrence on the part of persons who habitually drive cars when on a practically straightaway such as the Golden State Highway in the sparsely settled sections of the county. The jury may have concluded, well within its province, that notwithstanding Lindemann's testimony, which was offered in an effort to fix responsibility on Ewing, nevertheless defendants did not meet the burden cast upon them of showing that Lindemann knew or should have known that Ewing was intoxicated, and if he did know that fact, that he was negligent in continuing to ride with Ewing to the time the accident occurred.

In determining the question—conceding as we must, by reason of the jury's implied finding that intoxication on the part of Ewing was the proximate cause of the accident—there was other evidence bearing upon the other issue as to Lindemann's alleged negligence which the jury was duty bound to consider in determining whether Lindemann in fact had reason to believe or in fact was convinced by what he saw, that Ewing was in an unfit condition to drive his car.

On the question as to whether Ewing exhibited definite symptoms of intoxication four witnesses were called. Dr.

Lum, who was on the scene shortly after the accident, testified that he was of the opinion that alcohol had altered or slowed Mr. Ewing's reaction to such an extent that his condition would come fairly within the limit of the definition of intoxication as given by the court. He said his speech was pretty good, and that he exhibited interest in Lindemann's condition. The doctor said he had difficulty in arriving at the conclusion that Ewing's case came within the definition of intoxication because of the multiplicity of definitions on the subject. But whether a layman would have been able to diagnose his condition is quite another matter.

Two trained nurses at the hospital who administered to Mr. Lindemann saw and talked with Mr. Ewing separately for some considerable time, approximately an hour after the accident, and both testified that he appeared quite normal in every respect and exhibited no signs of intoxication. Mrs. Helen Lum, wife of Dr. Lum, the physician who attended Mr. Lindemann, sat in the same seat with her husband and Mr. Ewing as they drove from the scene of the accident to the hospital, and she testified that Mr. Ewing conversed entirely rationally; that she detected the odor of liquor on his breath but that there was nothing in his mental or physical appearance, so far as she was able to discern, which would indicate that he was affected with intoxicating liquor.

But conceding that Lindemann discovered on the journey that Ewing appeared to be somewhat affected with intoxicating liquor, would the average reasonable man in the circumstances of the case have felt warranted in telling him he was intoxicated and getting out on the roadside? Lindemann went as far as he felt justified in going, measured by all that had occurred before the accident. His testimony would indicate, at the most, that prior to the accident he was in an uncertain state of mind as to whether Ewing was in a fit condition to drive. He was comfortable when Ewing heeded his suggestion not to be in a hurry, but became uneasy when the speed was increased to the point where he thought it was too high. No accident or near accident happened in fifty-five miles of travel and there is no evidence that there was any wobbling of the car or that his driving was unsteady.

Lindemann was not riding as an ordinary guest. He had been solicited by Ewing to attend the company's meet-

ing and requested to bring with him the farmers in his locality. He had been especially importuned by Ewing to ride with him. He was a debtor of the company and an applicant for an additional loan from the company. The company advised with its debtors as to its annual budgets. Both parties were anxious to discuss matters of business. Ewing was the manager of a well-known financial institution. Would a reasonable person, in the light of all the circumstances bearing on or affecting the situation as shown by the case, have told Ewing that he was intoxicated and unfit to drive the car, and if he insisted on driving, as his manner indicated, have gotten out of the car on the roadside at a late hour at night and made his way the best he could along the highway? This question was for the jury's determination, and unless the plaintiff's conduct was so far contrary to the rules which govern the conduct of reasonable men in the ordinary affairs of life, or violates some rule of law, the jury's verdict and the trial court's judgment are not subject to annulment by an appellate court.

Some comment adverse to plaintiff's action arises out of the fact that when the parties approached Califa, five miles south of Chowchilla, the residence of Ewing, plaintiff suggested to him that instead of turning into the Pacheco Pass highway they proceed to Chowchilla, where Ewing could remain, and plaintiff would drive the car to Los Banos, and as Ewing was to call at his home on the following day to look over his ranch, he could drive the car home and thereby save himself a night drive from Chowchilla to Los Banos, the round trip distance being approximately sixty miles. Mr. Ewing replied: "I would be glad to take you home, I don't care if I get home a little later." Mr. Lindemann then said: "Tom, if you feel that way it is all right." This does not sound like a man unduly apprehensive of the condition of his driver. Lindemann said that he made the suggestion with the expectation that Ewing would accept the proposition, as he would have felt easier driving the car himself. The jury, however, placed such construction upon and gave such weight to this testimony as it felt it merited or deserved. This criticism is placed on the ground that Lindemann did not strenuously remonstrate against what he thought to be excessive speed. It is the rule that the duty to remonstrate against excessive speed is not absolute but depends on the circumstances of the par-

ticular case, and usually presents a jury question. (Huddy, Ency. Automobile Law, vol. 5-6, sec. 144.)

The testimony of Lindemann was subject to the same scrutiny as the testimony of any other witness and the jury was at liberty to accept it all, or a part only, or none, and further, to consider whether or not the impression or opinion as expressed from the chair as to how Ewing appeared was formed on the night in question or whether it was the opinion or impression subsequently formed after reflection upon the accident itself, colored by the expert opinion of his physician. The fact that Lindemann continued to ride with Ewing may have some evidentiary value either as a refutation of intoxication or as convicting him of negligence, as the jury may have determined in its discretion.

It is urged that the court erred in instructing the jury upon the subject of the measurement of damages. The instruction given by the court was taken *verbatim* from *Storrs v. Los Angeles Traction Co.*, 134 Cal. 91, 92, 93 [66 Pac. 72], and has since been repeatedly approved by this court and the District Courts of Appeal. Appellants admit that the instruction is correct as a general proposition of law, but contend that there was no evidence of any kind introduced as to the value of plaintiff's time while he was disabled or as to his earning power. We are of the opinion that there is evidence in the record from which the jury could have determined both elements of damage on the theories set forth in the authorities which discuss the proposition. Besides, the jury was instructed that the burden of proof was upon the plaintiff to prove every essential element of the case by a preponderance of evidence, and it cannot be presumed that the jury disregarded this admonition by including as damages elements which had no evidentiary foundation.

The evidence is conclusive on the issue that Mr. Ewing was the agent of the defendant San Joaquin Cotton Oil Company and was acting within the scope and course of his employment. The evidence on this issue is all one way and does not merit discussion.

Appellants have cited many cases in our own jurisdiction in which the intoxication of the driver of the car has been held to bar recovery by the injured guest. Upon examination it will be found that practically every one of said cases involved the affirmance of an order directing a verdict or an

order for judgment notwithstanding the verdict of the jury. The facts of those cases are entirely different from the facts of the instant case. Many of them record nothing more nor less than orgies of intoxication in which the occupants of the automobiles went from one bootleg joint or private drinking place to another and the members of the party were in a maudlin condition when the accidents happened.

It is somewhat significant that the author of the district court opinion under review and his associates are the authors or participated in the affirmances of a number of the decisions relied upon by appellants as furnishing precedents for the reversal of the instant case. The facts of the instant case are not the facts upon which the decisions in cited cases were made.

 This brings us to the question as to whether the verdict in the sum of $62,500 is excessive. Appellants call to our attention cases which by way of comparison show that it ranks in amount among the highest ever awarded by the courts of this state. A number of cases are found in our reports involving cranial and brain injuries, loss of sight, loss of limbs and irreparable injuries to the nervous system in which the damages assessed were considerably under those awarded in the instant case. There is no doubt but that the plaintiff was very seriously injured, but it would seem to a layman that the prognosis is fairly good for a restoration to fairly good health. The effects of some of the injuries are permanent. His left hand shrunk from the injury and it is probable that he will never again regain complete use of it. His face has been disfigured by the breaking of several bones in both upper and lower jaws—the mandible and maxilla were injured to the extent that the spongy bones in which the teeth are set had to be dissected out. Of course, the teeth that were not knocked out by the impact will have to be extracted. The upper jaw sustained several fractures from the cheek bone to the upper gums. His jaws are somewhat out of line and the palate had to be removed. He also suffered several cranial fractures and his nervous system has become seriously impaired. He was a strong, vigorous man in middle life and was active in agricultural pursuits, especially in cotton production. He was confined in the hospital for a period of one month and required medical attention for some time

thereafter, but was not bedfast. His close acquaintances testified that he is not the man he was before the accident.

It is most difficult to·fix just compensation for personal injuries sustained in cases where cranial injuries have been sustained or the nervous system has received severe injury. One of the physicians testified to the possibility of cranial injuries producing epilepsy. This possibility seems, under the prognosis, to be very remote. Just how much this possibility may have enhanced the verdict cannot be estimated. Upon a consideration of the entire record we feel that the verdict is somewhat excessive and should be reduced in the sum of $12,500.

It is ordered that if the plaintiff within thirty days from the filing hereof file with the clerk of this court his written consent to a modification of the judgment by a deduction therefrom of the sum of $12,500, leaving the judgment to stand for $50,000 and costs of suit, said judgment be modified accordingly, such modified judgment to bear interest at the legal rate from the date of the entry of the original judgment in the superior court; but if such consent be not so filed within said time, the judgment shall be reversed.

It is so ordered.

Waste, C. J., Langdon, J., Shenk, J., and Thompson, J., concurred.

On March 10, 1936, the judgment in the above-entitled case was modified by the following order:

WASTE, C. J.—The plaintiff and respondent herein having filed on March 6, 1936, his written consent thereto, pursuant to direction in the decision of this court filed February 28, 1936,

It is hereby ordered that the judgment herein be modified by deducting therefrom the sum of $12,500, leaving the judgment to stand for $50,000 and costs of suit, such modified judgment to bear interest at the legal rate from the date of the entry of the original judgment in the superior court, and as so modified the judgment is affirmed.

Shenk, J., Seawell, J., Thompson, J., Curtis, J., and Langdon, J., concurred.

Rehearing denied.