[Civ. No. 13308. First Dist., Div. One. Mar. 3, 1947.]

GEORGE A. SCHRAEDER et al., Respondents, v. E. W. ROBINSON et al., Appellants.

Sullivan, Lane & Clarke for Appellants.

Norman S. Menifee for Respondents.

BRAY, J.—Appeal by defendants from a judgment in favor of plaintiffs in the sum of $25,000 for the value of a race horse claimed to have died by reason of the negligence of defendants in transporting it. The judgment was against defendant E. W. Robinson individually, and doing business under the

firm name and style of Robinson Truck Company, hereinafter referred to as defendants.

Plaintiffs, husband and wife, owned a thoroughbred race horse named Sir Grant, which defendants, who were engaged in the business of transporting horses, undertook to transport and deliver from Arcadia in Southern California to Bay Meadows. Upon its arrival at Bay Meadows, the horse was suffering from pneumonia, from which disease it died four days later.

The complaint sets forth two causes of action. The first alleged that the parties entered into a contract under which defendants were to ship and transport the animal between the two locations, and that the defendants so negligently and carelessly conducted such shipping and transportation that the horse became ill and died. The second cause of action alleged that the defendants had contracted to transport and deliver the horse within a period of approximately fourteen hours; that defendants had failed to deliver the horse until a period in excess of forty hours, had failed to provide any care or attention for the horse during that period, and as a result of neglect and of breach of the contract to deliver within the time specified, the horse contracted an illness and died. The defendants' answer set up general denials to both causes of action, and then set up the affirmative defense that the death of Sir Grant was due to an act of God. During the trial the court permitted defendants by amendment to set up a second affirmative defense, namely, that plaintiff George Schraeder had executed a writing limiting defendants' liability to $200.

The court did not find specifically upon the second cause of action, but did find in favor of plaintiffs on the first cause of action, and against the defendants on both of the affirmative defenses.

The first contention of defendants on appeal is that the evidence is insufficient to support the court's findings, particularly the finding that the defendants "so carelessly and negligently conducted the transportation and shipping of said horse" that it became ill and died. In this behalf, defendants claim that the facts, which, on the point of time consumed, are not controverted, do not establish any negligence whatever.

The evidence of the plaintiffs was to the effect that on Saturday, September 22, 1945, plaintiff George Schraeder phoned defendant Robinson and arranged to have defendants' van pick up Sir Grant at Arcadia on Monday afternoon, and trans-

port it to Bay Meadows. Three other horses then in plaintiffs' care, but now owned by him, were to be transported likewise. The agreed shipping price for all horses was $30 each. The horses were loaded on the van at Arcadia at about 3:30 p. m. Monday. Plaintiff Schraeder was told by defendants' driver that he had to pick up three more horses at Hollywood Park and that he would arrive at Bay Meadows early the next morning, and that the horses might "beat" plaintiffs there, unless plaintiffs, who were planning to drive up to Bay Meadows, left right away. The van containing the horses actually did not reach Bay Meadows until Wednesday afternoon. From the time the horses were loaded in the van at Arcadia on Monday afternoon about 3:30 o'clock until their arrival at Bay Meadows on Wednesday about 2:30 p. m., the horses never left the van. The defendants' driver testified that on the way up after he received the horses on Tuesday they were not watered, and were only fed once with some hay the driver took out of a field. All of the horses were sick on arrival, and Sir Grant was "very sick." Plaintiffs sent for a veterinarian who treated the horse, but in spite of treatment it died on Saturday. On two occasions, once on Tuesday afternoon and again on Wednesday morning plaintiffs called defendant Robinson, inquiring as to the whereabouts of the horses, and were told that they were on their way, and that Robinson could not account for the delay in not getting there.

Ordinarily the trip from Arcadia to Bay Meadows should not take over fifteen to sixteen hours. The evidence indicated that the delay here was due to the fact that the van, after getting the four horses from plaintiffs, then went out of the direct route north to pick up other horses, one at San Fernando, one at Santa Monica, and one at Malibu Beach. Also it stopped at Pebble Beach to deliver one of the horses, and at Los Gatos to unload another one, and finally on to Bay Meadows.

Defendant Robinson testified that it was understood between him and plaintiff Schraeder that the horses were to be shipped on what he called the "milkman's route," which meant that the van would pick up other horses than those shipped by plaintiffs. Plaintiff Schraeder denied that there was any such conversation. This merely created a conflict of testimony as to whether plaintiffs had expressly contracted for a delayed shipment, which conflict the lower court resolved in favor of plaintiffs.

The only medical testimony was that produced by the plaintiffs. Two veterinarians, one of whom performed an autopsy on the dead horse, testified that the length of time the horse was in the van was the cause of the death of the horse; that ordinarily horses shipped the distance involved in this case sometimes ran a little temperature, but would not be "into a pneumonia" as this horse was; that it was the prolonged exposure in the van for about forty-five hours that caused the pneumonia condition.

The defendant Robinson testified that in most cases where horses are shipped as far as these horses were, the owner or his trainer either goes with the horses or makes some provision to feed and water the horses en route. Plaintiff Schraeder testified that there was no such custom on a trip of this nature, and that moreover he asked defendants' van driver if he should send a man along, and the driver said that it would not be necessary, as two men were going with the van so there would be no room for another man. However, this question seems not to be of great importance, as the medical testimony based the cause of the sick condition of the horses on the length of time they were exposed in the van, rather than on a failure to feed or water them.

There was sufficient evidence to justify the court in finding that the sickness of Sir Grant was due to defendants' negligence in keeping the horse in the van for almost forty-five hours. Defendant Robinson admitted having had experience in the shipping of horses between Los Angeles and San Francisco for many years, and with the fact that, as testified to by the veterinarians, horses being shipped that distance frequently get "shipping fever." In view of the propensities of thoroughbreds to contract shipping fever, the delay in transportation and the great length of time which defendants kept the horse exposed on the van, certainly constituted negligence. This court cannot reasonably hold that as a matter of law, such delay was not negligence.

So far as defendants' contention that the custom required that plaintiffs send a man along to look after the horses is concerned, the court found under the conflict of testimony against the defendants. The same is true as to defendant Robinson's statement that plaintiffs had agreed to a "milkman's route" because it was cheaper—$120 for the four horses, as against $240, for which "we would have gone direct right up." Plaintiff Schraeder denied this, and pointed out

that as three of the horses were owned by others, and their transportation was to be paid by their owners, the difference in cost to plaintiffs for the transportation would not have been very great. Here again was a conflict of testimony which the lower court resolved against defendants. Even though plaintiffs had contracted for the "milkman's route," the testimony of Schraeder and the two veterinarians was very definite that the length of time this particular trip took was an unreasonable period to leave the horses in the trailer without removing them from the van. That this constitutes negligence is elementary. As stated in *Swiney* v. *American Express Co.,* 144 Iowa 342 [115 N.W. 212, 214, 122 N.W. 957], the carrier must take notice of the propensities of domestic animals. (As pointed out before, defendant Robinson testified that he knew of the propensities of thoroughbreds to acquire shipping fever.) In that case it is said: ". . . if the shipment be of live stock, and it die of disease or inherent weakness, or become sick without fault, or receive injury through its own vicious propensities, in such case the law very properly places the loss upon the owner, and not upon the carrier. *Blower* v. *Railroad Co.* L.R. 7 C.P. 662; *Kinnick* v. *Railroad Co.,* 69 Iowa, 665, 29 N.W. 772; *Betts* v. *Railroad Co.,* 92 Iowa, 343, 60 N.W. 623, 26 L.R.A. 248, 54 Am.St.Rep. 558. But this principle is not to be so extended as to relieve the carrier from the duty to take notice of the ordinary weakness, character, and propensities of domestic animals, and to make such provision against loss or injury therefrom as may reasonably be done in furnishing the means of transportation and providing for the protection of the property during transit. *Kinnick* v. *Railroad Co., supra; Betts* v. *Railroad Co., supra.* It logically follows from these rules, and from the fact that ordinarily a carrier alone has knowledge of the manner in which the shipment has been forwarded and cared for, that where property whether dead freight or live stock is found to have suffered loss or damage in transportation, especially where the shipment is not accompanied by the shipper, or a caretaker in his service, the burden is upon such carrier to show facts which relieve it from liability."

██ Defendants' second point is that finding No. VI of the trial court is not supported by the evidence. Here the court found that plaintiff Schraeder did not make or execute a contract limiting the maximum liability of the defendants in transporting the horses to $200 per horse.

The circumstances concerning this alleged contract were these: John G. Murray, defendants' driver, who delivered the horses at Bay Meadows, testified that plaintiff Schraeder signed this alleged contract in his presence; that he had made out the contract in the van at Bay Meadows, and that he antedated it as of the day when the horses were first loaded at Arcadia. Plaintiff Schraeder denied that he had ever signed such a document, and when it was exhibited to him in court, testified that the signature was not his, and that he had never seen the contract until it was shown him by his attorney after the suit was filed. It is obvious that the court believed the plaintiff's testimony on this point, and did not believe the testimony of the witness Murray. After Schraeder had testified that the signature was not his, no evidence on the subject in addition to the testimony of the driver was offered by defendants. Defendants stress considerably the fact that the court, during the trial, admitted this alleged contract in evidence, and further permitted defendants to amend their answer to set up the defense of this alleged contract. Defendants seem to think that by the mere admission of the contract into evidence and the allowing of the amendment, such act upon the part of the court constitutes a finding that the contract was signed by Schraeder. No authorities are cited upon this point; and it is obvious that such is not the result of permitting the contract to be admitted into evidence or permitting the defendants to set up a defense in the pleadings based upon such alleged contract. The court positively in its findings of fact found that this contract was never executed by Schraeder. In defendants' brief the statement is made that the reviewing court is not bound by the construction of the contract by the trial court, but must make the final determination in accordance with the applicable principles of law, citing *La Lumia* v. *Northern Cal. Packing Co.,* 75 Cal.App.2d 917 [172 P.2d 94], at page 922. Neither this case nor defendants' contention is in point for the reason that this court is not called upon to construe an agreement which the lower court has positively held was never signed by the party to be charged.

Defendants' opening brief contains this language: "... the record does not contain any denial on Mr. Schraeder's part that he gave authority to anyone else to sign the contract." Just what is defendants' contention in this behalf is

not clear. The driver, Murray, testified that he saw Schraeder sign the contract in his presence. Schraeder denied doing so. There was no contention made in the lower court that anyone other than Schraeder signed the document. It does not lie with the defendants to claim now that the driver's testimony is untrue and that someone signed the agreement with Schraeder's authority. Nor was Schraeder at any time called upon to deny giving such authority when the only contention made was that he personally had signed it.

▮ Defendants' third point is that the record is devoid of any proof that Sir Grant was in good physical condition at the time he was turned over to defendants for shipping, and that the fact that the other horses shipped with Sir Grant all had shipping fever on arrival, and yet recovered, while Sir Grant died, indicates that Sir Grant was not in good health at the time of acceptance for shipment. Defendants cite *Merchant etc. Assn.* v. *Kellogg E. & D. Co.*, 28 Cal.2d 594, at page 599 [170 P.2d 923], as authority for their contention that the burden of proof was on plaintiffs to prove that Sir Grant was in good condition when delivered to the carrier. But as pointed out in that case, at page 599, that rule does not apply where there is evidence of an intervening cause of injury. In the case at bar there is direct proof that the delayed transportation was the cause of the illness, not only of Sir Grant but of all the other three horses who were initially placed in the van with him.

Moreover, the last mentioned case refers to 13 Corpus Juris Secundum, page 538, section 254 (d). That reference states: ''The burden is on the plaintiff to show that the goods were in good condition when delivered to the carrier, but when the facts raise a presumption that the goods were in good condition when delivered to the carrier, the latter has the burden of showing that they were not in good condition. *If the goods were open to inspection, the burden of proving their bad condition when the carrier received them is on the carrier.*'' (Italics added.) (See, also, 10 C.J. p. 371, § 571, and long list of cases cited under note 65.)

Certainly defendants could tell by inspection when the horses were turned over to them for transportation whether or not they were in good condition; and assuming, as suggested in defendants' brief, that Sir Grant was predisposed to shipping fever (of which there was no evidence), the car-

rier would not be relieved from responsibility for a long-delayed transportation because of that fact.

In *Swiney* v. *American Express Co., supra* (115 N.W. 212), a valuable Poland China sow was injured in transit between Milwaukee, Wisconsin, and Webster City, Iowa. The defendant shipper there made the contention that the plaintiff should have alleged that the animal was in good condition when delivered for shipment. The court held, at page 215 [115 N.W.] : ''We find no authority for the proposition that an express allegation of good condition at the time of its shipment is necessary to the statement of a good cause of action against the carrier. On the contrary, the practically universal holding is that the essential facts necessary to make a prima facie case is the ownership of the property, its delivery to and acceptance by the carrier for transportation, and loss or damage suffered thereby in transit. Proof of the alleged injury will usually, if not always, involve the necessity of showing the condition of the property when shipped, not because the condition at the date of shipment is an essential element of the right of action, but as a material matter of evidence from which with other facts the jury may find whether the property sustained any injury or loss en route. Indeed the rule is frequently stated that the good order of the shipment is to be presumed from its acceptance by the carrier and the issuance of a receipt or bill of lading therefor specifying no defects. (6 Cyc. 517, 518.) There was no error in overruling the motion in arrest.''

To the same effect is the following language in *Adams Express Co.* v. *White,* 132 Md. 626 [104 A. 110, 111] : ''The second prayer asked that a verdict be returned for it, because there was no evidence to show the condition of the machine when it was delivered to the defendant. The refusal of this prayer was correct. There is a well-established rule that in cases of this character a presumption arises from the fact of the receipt of the goods by the carrier without objection or exception noted in the shipping receipt that as far as the condition was apparent on ordinary inspection the goods were in good condition. See 10 Corpus Juris, 371, and long list of cases under note 65. The bill of lading, or shipping receipt, contained no statement as to the condition of the machines when receipted for. Neither did the evidence in the record rebut in any way the presumption.''

While there is no direct evidence as to the horse's condition at the time of delivery to the carrier, there are certain inferences which fairly may be drawn from the testimony. Dr. Whitman, the veterinary who saw the horse's condition after arrival at Bay Meadows and also performed the autopsy on it, testified that except for the pneumonia conditions which caused death, the horse was apparently otherwise in sound condition; that shipping fever could develop in an hour or so in a shipping van. He further testified that the horse was not in a poor condition but in a good condition to get pneumonia. While this is a rather perplexing statement in itself, it is evident from the record that the veterinary meant, and all parties understood him to mean, that in his opinion the general condition of the horse was such as would not predispose it to that illness, and that the horse ordinarily would not contract pneumonia on a trip taking the usual length of time between Arcadia and Bay Meadows. While this method of trying a case is not to be commended, this expert testimony, together with the rule above cited from 13 Corpus Juris Secundum 539, and 10 Corpus Juris 371, and the cases mentioned herein, to the effect that the burden was cast upon the defendants to show that the physical condition of Sir Grant was not good when defendants received him for shipping, fully support the court's implied finding that the horse was in good condition at the time of delivery to the carrier. The testimony of the veterinarians as to the cause of death is sufficient alone to throw the burden of explanation on the carrier.

Defendants' fourth point is to the effect that the court applied the wrong measure of damages in determining the value of the horse. The only testimony concerning value was that given by the plaintiff Schraeder himself, and by plaintiffs' witness William R. Buster, who qualified as a trader in race horses. Both witnesses placed $25,000 as the fair market value of the horse at the time of its death. Neither witness was asked whether such was the market value at any particular place. In defendants' brief it is stated: "It is very possible that Mr. Buster and Mr. Schraeder of Arcadia were of the opinion that the horse was worth $25,000, and it is very possible that no one at Bay Meadows would consider the horse to be of that value or anywhere near that

value," citing section 3317 of the Civil Code, which provides that the detriment caused by a carrier's delay in the delivery of freight is deemed to be the depreciation in the market value at the place where it ought to have been delivered. Defendants then contend the market value should have been established as of Bay Meadows, rather than generally. There is nothing in the record to show that the market value as testified to was not the market value in the county where the witnesses were testifying, to wit, San Mateo, in which county Bay Meadows is located; and it is a fair inference from the testimony of these witnesses that their valuation was the fair market value of the horse to persons who customarily dealt in that type of property, regardless of the place at which a sale might take place. It is significant that defendants offered no testimony whatever on the question of value, either at Bay Meadows or anywhere else. ■ Plaintiff Schraeder, as the owner of Sir Grant, was qualified to testify as to the value of the horse (*Shotwell* v. *Bloom,* 60 Cal.App.2d 303 [140 P.2d 728]), and Buster, who was properly qualified as a horse trader familiar with Sir Grant's ancestry and potentialities, was also a competent witness (9 Am.Jur. p. 954; *Chicago & N. W. Ry. Co.* v. *Calumet Stock Farm,* 194 Ill. 9 [61 N.E. 1095, 88 Am.St.Rep. 68]). The mere fact that Bay Meadows is some 300 to 350 miles from Arcadia raises no inference that the value of a race horse is any different at one California race track than at another.

■ Defendants' fifth point is that the judgment of $25,000 for the death of the thoroughbred horse is excessive, exorbitant and unreasonable. Defendants offered no testimony whatever upon the question of the value, nor did they cross-examine at any length either the plaintiff Schraeder or the horse trader Buster on this subject. The only examination made by defendants on this subject was the questioning of plaintiff Schraeder as to the earnings the horse had made at the tracks, and asking Buster if the horse had ever won a race. The plaintiff Schraeder testified that the horse had run in eight races including one at Del Mar, where he finished "in the money"; on one occasion ran second at Santa Anita, and on three occasions came in fourth; and that the total earnings of the horse had been about $1,000. Moreover, Schraeder testified that when the horse was a yearling, he had refused $10,000 for it; and on the day he loaded the horse he had been

asked by the Cameo Stock Farm to place a value upon it and the other horses, and that he had placed a value of $25,000 on Sir Grant. Both plaintiff Schraeder and Buster testified that Buster had offered plaintiff $25,000 the day the horse was loaded at Arcadia. Defendants say, ''it is unreasonable and highly improper for the trial court to assume that a horse with such a record is worth $25,000 or any fraction thereof.'' However, there is no testimony in the record of any value other than $25,000. Buster had bought and sold race horses over a period of time, and he not only placed that value on the horse, but actually had offered to buy it for that sum. While to a layman $25,000 seems a large sum to pay for a horse, the court had before it no evidence to the contrary, and there is no manner in which this court can determine the value of a race horse other than from the testimony introduced below. The small earnings of the horse, which was only a two-year-old, would not necessarily mean that the animal was not extremely valuable. Its blood lines, its potentialities, and the form, speed, courage and stamina which it had displayed as a young horse would bear great weight in labelling it as an exceptional prospect of considerable monetary value. Buster described the ancestry of the horse and stated that many of the horses it had run with had sold for more than $25,000, and that the horse was bred for distance and ''was never beaten from behind.''

Defendants in their opening brief cite cases such as *Hart* v. *Farris*, 218 Cal. 69 [21 P.2d 432], to the effect that when the damages awarded in the lower court are so disproportionate as to shock the sense of justice and raise a strong suspicion that the award was based on prejudice or passion, the appellate court must reverse the judgment. There is no doubt but that that is the law.

In a letter memorandum subsequent to oral argument, defendants submit three cases as authority for the proposition that appellate courts may reduce awards of damage without any reference to passion or prejudice, where the excess of damage is not supported by the evidence. These cases are *Lindemann* v. *San Joaquin Cotton Oil Co.*, 5 Cal.2d 480 [55 P.2d 870]; *Ure* v. *Maggio Brothers Co.*, 32 Cal.App.2d 111 [89 P.2d 436]; and *Maede* v. *Oakland High School District*, 212 Cal. 419 [298 P. 987]. While the Maede case was one involving a passion and prejudice finding, and hence not in

support of this point, the other two cases do sustain the proposition contended for, and it undoubtedly is the law. But neither of these propositions of law are pertinent here for the reason, as hereinbefore pointed out, that this court cannot say on the evidence in this case either that the award shocks the sense of justice and therefore raises a strong suspicion of prejudice or passion, or that the award is excessive. The only manner in which the trial judge could have awarded a lesser amount would have been to disregard completely the evidence in the case and arbitrarily award a lesser sum than a horse trader presumably fully familiar with the value of race horses, a subject not generally known to the layman, testified was the market value of the horse, and the amount which he himself had offered for it; and likewise, this court would have to make such a reduction without any evidence to justify its action.

The judgment is affirmed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied April 2, 1947, and appellants' petition for a hearing by the Supreme Court was denied May 1, 1947.