Filed 12/28/15  Timber Management Services v. Zeinfeld CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| TIMBER MANAGEMENT SERVICES, INC., et al., | C068213 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34201000082738CUPOGDS) |
| v. | |
| STEVEN ZEINFELD et al., | |
| Defendants and Respondents. | |

Parties who prevailed as defendants in a prior Shasta County lawsuit are plaintiffs in this Sacramento County lawsuit for malicious prosecution and related claims against parties involved in prosecuting the prior lawsuit.  The current plaintiffs, Timber Management Services, Inc., and Patricia Pullen, individually and as Executrix of the Estate of Carl Pullen, Deceased (collectively, TMS), appeal from the trial court's dismissal of their lawsuit against current defendants, Downey Brand LLP, Frank Perrott, and James Lucas (collectively, Downey), and Steven Zeinfeld,[1] after the court granted

---

[1] Perrott and Lucas are lawyers at the Downey law firm, which represented Hydrolve in the prior lawsuit.  Zeinfeld's role is unclear.  According to the Shasta County Superior

1

defendants' motions to strike the complaint under Code of Civil Procedure section 425.16,[2] the Strategic Lawsuit Against Public Participation statute (the anti-SLAPP law). TMS claims evidentiary error and argues its evidence compelled denial of the anti-SLAPP motions.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND
### The Underlying Lawsuit - *Hydrolve v. TMS*

Downey provided legal representation to Hydrolve in the underlying lawsuit filed in Shasta County in June 2006. Initially, the Shasta complaint named only TMS the corporation and sought specific performance or breach of contract damages to enforce an agreement for the sale of 160 acres of real property containing a permitted landfill.[3] The complaint alleged that in August 2005, Hydrolve, through its CEO Kevin Doran and its president Philip Caldwell, entered an agreement to purchase the land for $2,050,000, with TMS representative Carl Pullen (Pullen). TMS asserted a statute of frauds defense (Civ. Code, § 1624[4]) on the ground that an agreement for the sale of real property must be written, and there was no such writing. Downey, representing Hydrolve, argued that

---

Court statement of decision, Zeinfeld financed Hydrolve's Shasta County lawsuit. The Shasta County Superior Court transcript is not part of the record in this appeal, and Zeinfeld admits nothing. As we discuss *post*, plaintiffs have no evidence to support their claims against Zeinfeld.

[2] Undesignated statutory references are to the Code of Civil Procedure.

[3] Neither the complaint, nor the first amended complaint is part of the record on appeal.

[4] Civil Code section 1624 provides in part: "(a) The following contracts are invalid, unless they, or some note or memorandum thereof, are in writing and subscribed by the party to be charged or by the party's agent: [¶] . . . [¶] (3) An agreement . . . for the sale of real property, or of an interest therein; such an agreement, if made by an agent of the party sought to be charged, is invalid, unless the authority of the agent is in writing, subscribed by the party sought to be charged."

certain memoranda constituted the required writing and even if they did not, TMS should be estopped from asserting a statute of frauds defense, because Hydrolve had detrimentally relied on the sales agreement by expending time and money to develop the property. For example, Hydrolve had obtained a commitment to issue a $4,925,000 tax exempt bond to finance development of the property.

After the complaint was filed, Hydrolve recorded a lis pendens.

On August 14, 2006, TMS filed a demurrer on the grounds there was no binding agreement to sell the property to Hydrolve and the complaint failed to include the contract documents and falsely asserted there was an agreement. On September 12, 2006, after a hearing, the Shasta County court overruled the demurrer.

On August 28, 2006, TMS moved to expunge the lis pendens. In opposition to the motion to expunge the lis pendens, Hydrolve submitted documents including:

(1) An August 2, 2005, Option and Right of First Refusal (the Option agreement) giving Hydrolve the sole and exclusive option and right of first refusal to purchase the property and to negotiate and enter into an agreement to purchase the property for one year, subject to renewal or extension if Hydrolve made a showing of due diligence efforts to develop the property;

(2) An October 2005 letter to TMS from a third party offering to purchase the landfill portion of the property for $1,750,000;

(3) An unsigned November 2005 document on Hydrolve letterhead referenced by TMS as a "Term Sheet," stating in part: "Hydrolve LLC ('Buyer') would like to apprise [TMS] ('Seller') of its intentions to exercise its Option and First Right of Refusal to purchase the Twin Bridges Landfill property as outlined in the Option and Right of First Refusal for Real Estate Purchase and Development Rights Agreement(s) executed on August 8, 2005. [¶] 1. It is agreed that 'Buyer' will pay . . . $1,750,000 dollars for the

40 acres, which includes the Twin Bridges Landfill. It is agreed that Buyer will purchase [the] remaining approximately 120 acres for $ 2,500.00 per acre";[5]

(4) A November 13, 2005, letter from Hydrolve's Doran to TMS's Pullen, stating in part: "As we discussed . . . Hydrolve intends to exercise its Option and First Right of Refusal to purchase the Twin Bridges Landfill property . . . . Last Tuesday we reached an agreement . . . on the purchase terms. I have provided a copy of the changes you requested on Tuesday to the agreement which reflects the changes we wrote down";

(6) An unsigned November 2005 document incorporating the changes referenced in the November 13, 2005, letter;

(7) An April 2006 document indicating there was resolution with the California Pollution Control Financing Authority to issue tax-exempt bonds to finance development of the property upon application of Twin Bridges Development, Inc.;

(8) A May 3, 2006, letter from Hydrolve to TMS, stating in part: "The purpose of this Letter is to outline Hydrolve LLC's intent to finalize the purchase of the Twin Bridges landfill property and to give notice to extend our option for another year." The letter asked TMS to execute the "attached [] copy of the agreement we reached in our meeting on Thursday, April 20, 2006 titled Twin Bridges Purchase Agreement." If TMS did not return the executed contract by May 8, 2006, the offer would be rescinded, and Hydrolve would exercise its option to renew the Option agreement for one year; and

(9) A May 10, 2006, letter from TMS's attorney to Hydrolve, asking for a due diligence showing to support extension of the Option agreement, and stating, "As you are aware, our client has declined your offer to purchase the property under the terms proposed in your letter of May 3, 2006."

---

[5] This document bears handwritten changes to other terms and initials.

Hydrolve's opposition to the motion to expunge the lis pendens also included a declaration from its CEO, Kevin Doran, attesting that as consideration for the Option agreement, Hydrolve agreed to assist TMS in closing the landfill, and in fact did assist with the closure. Hydrolve engaged in efforts to determine if it could develop an eco-industrial center on the landfill property. After a third party submitted an offer to buy the property, Doran met with Pullen on November 7, 2005. They agreed to terms for Hydrolve to buy the property. Pullen shook Doran's hand and said, " '[W]e ha[ve] a deal,' " and gave Doran a key to the gate on the property. The next day, Doran returned to Pullen's residence with a typed document intending to confirm the agreement they had reached the day before. Pullen made changes, which were written on the document. Thereafter, the two of them initialed the document and Pullen again stated, "[W]e have a deal," and shook Doran's hand. A copy of the document was attached to Doran's declaration. Doran attested he agreed to delay opening escrow, which had been planned for December 2005, at Pullen's request because Pullen said he had not yet obtained a gravel permit or written documentation required for closure of the landfill. Doran attested that Hydrolve applied to the California Pollution Control Financing Authority (CPCFA) to obtain tax-free bond financing to develop the property. CPCFA subsequently passed a resolution authorizing financing not to exceed $4,625,000. Doran kept Pullen informed of the status. In March 2006, Pullen told Doran he would have the necessary government approvals and that escrow could open in April or May 2006. In April 2006, Pullen said he fell and broke his hip and had not yet obtained the necessary governmental approvals for the gravel permit and landfill closure. When Doran next tried to contact Pullen, Mrs. Pullen said he was too ill to conduct business. Doran then received the May 10, 2006, letter from TMS's attorney. Hydrolve then filed the Shasta lawsuit and recorded a lis pendens. On June 16, 2006, Pullen called Doran and said he would honor the agreement. The lawyers would work out the details. After nearly a

5

month, TMS's attorney contacted Doran and demanded almost double the price previously agreed to by the parties in order to close the deal.

Doran also attested that Hydrolve would suffer "substantial damage" if TMS did not follow through on the sale. He stated that he had allocated most of his time to developing the project and dedicated most of Hydrolve's resources, including Hydrolve's scientists, lawyers, and consultants. He said he had travelled to Redding each month since entering into the purchase agreement. He focused exclusively on this location for Hydrolve's eco-industrial park and passed up other possible sites that were no longer available. He spent time negotiating with their eco-industrial park clients and tenants, investors, and investment bankers. He also attested that if Hydrolve could not complete the purchase, Hydrolve would lose its financing from the CPCFA. The CPCFA would thereafter be reluctant to finance Hydrolve.

After the first hearing on the motion to expunge the lis pendens, Perrot took Pullen's deposition. Pullen admitted that he had agreed to sell the property to Hydrolve in late 2005. Jerald Pickering (an attorney who had acted as legal counsel for both Hydrolve and TMS) testified in a November 2006 deposition that Pullen told him he had agreed to sell the property to Hydrolve. Pickering sent a letter dated November 10, 2005, to Pullen confirming the agreement and received no repudiation of the agreement in response to the letter.

In February 2007, the Shasta County trial court granted the motion to expunge the lis pendens on the ground that Hydrolve failed to meet its burden of demonstrating the probable validity of its claim. In so ruling the court said, "The intention of the parties is *not clear from the face* of the written document. *It is thus ambiguous* whether the document represents a meeting of the minds." (Italics added.) The court did not rule, however, that no contract existed or that a contract could not be established through extrinsic evidence.

Perrott attested that during discovery, he learned that despite Pullen's assurance to Doran they would proceed with the sale after obtaining governmental approval of the landfill closure plan, that TMS and Chuck Wolf, a local engineering contractor, had entered into a written agreement in early 2005 to let Wolf mine aggregate within the footprint of the landfill. TMS borrowed $250,000 from Wolf to close the landfill and obtain a mining permit, secured with a deed of trust on adjacent, less valuable property. TMS learned that an environmental impact report would not be needed to obtain the mining permit shortly before Pullen first denied having agreed to sell the property to Hydrolve. Based on this evidence and Doran having said that Pullen repeatedly assured him that TMS would sell Hydrolve the property up until April 2006, it appeared to Perrott that Pullen was deliberately stringing Hydrolve along pending the outcome of TMS's mining permit application. Downey prepared a motion for leave to file an amended complaint to add a fraud claim.

In September 2007, the trial court granted Hydrolve leave to file an amended complaint to add a cause of action for fraud against TMS and Carl Pullen. The fraud cause of action alleged that Pullen never intended to sell the property and secretly sought to develop a mining operation on the landfill portion of the property if the mining operation was permitted. Hydrolve further alleged that it did not know the mining plan involved " 'large portions of the existing landfill and adjacent areas' " on the property.[6]

At some point after the first amended complaint was filed, the Shasta trial court overruled TMS's demurrer to the fraud cause of action.

Pullen died in January 2008, and the underlying lawsuit continued as to TMS.

---

[6] According to TMS, Hydrolve knew all along about TMS's mining plans, because the August 2005 Option Agreement expressly stated, "[T]his agreement does not include the development of a gravel mining operation currently under development by TMS, which is separate from this Agreement." However, the Option did not specify the extent of the operation or the specific location on the property where the operation would be located.

Over Downey's objection, the Shasta trial court bifurcated for trial the issues of statute of frauds and estoppel to assert the statute of frauds. The issues to be decided in phase one as outlined by the court were (1) whether an enforceable agreement was reached, (2) if so, whether it was legally certain for enforcement, (3) whether there was consideration for any alleged agreement and extension of escrow, and (4) whether the contract claim was barred by the statute of frauds. When Perrott asked for clarification, the Shasta trial court confirmed that Hydrolve was not to present evidence pertaining to the promissory estoppel or fraud claims in the first phase of the trial.[7] The court emphasized, "This is a very limited bifurcated trial - are the essential terms there sufficient to satisfy the statute of frauds."

After Hydrolve presented its case on the first phase of the trial in oral and documentary evidence, TMS moved for judgment under section 631.8.[8] Hydrolve filed a

---

[7] After the Shasta trial court specifically indicated the first phase would relate to the statute of frauds defense, counsel for TMS stated, "Enforceability is an issue, too, not just under the statute of frauds, because that's the essential terms." To that the court replied, "Well, the reason I'm separating that out at this point is because I could find that there are essential terms that are ambiguous, and we then might go to the next -- may have to go to the next step of extrinsic evidence for the purpose of resolving the ambiguity, which may be a jury trial." Counsel for TMS responded, "Understood."

[8] Section 631.8 provides in pertinent part: "(a) After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make a statement of decision . . . . The court may consider all evidence received, provided, however, that the party against whom the motion for judgment has been made shall have had an opportunity to present additional evidence to rebut evidence received during the presentation of evidence deemed by the presenting party to have been adverse to him, and to rehabilitate the testimony of a witness whose credibility has been attacked by the moving party. . . . [¶] (b) If it appears that the evidence presented supports the granting of the motion as to some but not all the issues involved in the action, the court shall grant the motion as to those issues *and the action shall proceed as to the issues*

8

written objection, arguing among other things that the motion raised issues beyond the scope of the statute of frauds in the first phase of the bifurcated trial.

Thereafter, the Shasta trial court indicated its intent to grant the section 631.8 motion. Hydrolve objected to the tentative decision, in part on the ground that the court had bifurcated the issue of promissory estoppel and had not ruled on that matter. Hydrolve also requested a statement of decision, and the trial court directed TMS to prepare it.

By letter of March 3, 2009, TMS asked Hydrolve to provide by March 5, 2009, an offer of proof as to what evidence could support the fraud claim, which alleged Pullen made an agreement intending not to perform. According to TMS, Hydrolve ignored the request.

On March 23, 2009, the Shasta trial court issued the statement of decision. The court found merit in the statute of frauds defense. The court expressly found that there was no written memorandum reflecting any legally subscribed agreement containing essential terms between the parties for the purchase and sale of real property. The court also found the testimony of Doran and Caldwell was not credible.[9] The statement of

---

*remaining*. Despite the granting of such a motion, no final judgment shall be entered prior to the termination of the action, but the final judgment in such action shall, in addition to any matters determined in the trial, award judgment as determined by the motion herein provided for." (Italics added.)

[9] The Shasta County court's statement of decision stated in findings of fact numbers 85, 86, and 112: "85. Mr. Doran and Mr. Caldwell's claim that each believed the unsigned November 8, 2005 Term Sheet constituted an enforceable agreement to purchase the subject TMS property was unsupported by any credible evidence, and on all material issues in dispute, their testimony was totally lacking in credibility. [¶] 86. No reasonable person would believe either of the unsigned, undated November 8, 2005, Term Sheets would constitute an enforceable contract for the purchase and sale of this unique Property, which involved very complicated environmental and other issues to be fully addressed in a carefully drafted final purchase and sales agreement. In addition to Mr. Doran and Mr. Caldwell lacking any credibility, they simply seemed to be making the story up as they went along with their testimony which was extremely unreliable.

9

decision also included findings that "no reasonable person would believe" the memoranda in question constituted an enforceable contract and there was "no objectively tenable basis" for Hydrolve's claims.

On April 6, 2009, Hydrolve filed objections to the statement of decision, complaining among other things that the trial court granted judgment in favor of TMS on the contract claims without first determining whether promissory estoppel should bar TMS from relying on the statute of frauds.[10]  The Shasta trial court overruled the objections, but on April 20, 2009, issued a minute order setting October 14, 2009, for the trial on the fraud cause of action and further indicating that the court would determine whether promissory estoppel had been raised by Hydrolve's pleadings at that time.

According to Downey, at some point it advised the trial court that Hydrolve would likely dismiss the fraud claim "rather than proceed with a jury trial of this single cause of action with a limited potential recovery of damages," but Downey needed time to discuss the matter with its client and wanted to wait until the judge ruled on the objections to the statement of decision to resolve the uncertainty about the promissory estoppel matter.

On May 8, 2009, TMS served a motion for sanctions for a frivolous claim, under section 128.7, related to continued prosecution of the fraud claim.

---

[¶] . . . [¶]  112. [Hydrolve's] two main witnesses, Mr. Doran and Mr. Caldwell, were entirely lacking in credibility, and the Court finds their testimony to be unreliable.  Other witnesses testifying on behalf of [Hydrolve] were either blatantly biased or lacked recall of such significant events that the Court could not rely on other matters about which the witnesses testified.  For example, at the end of Mr. Zeinfeld's testimony, it was revealed that he was financing this litigation for [Hydrolve].  The attorney who represented Hydrolve, Mr. Pickering, lacked recall, inexplicably at times, of material facts."

[10]  Hydrolve also complained that the trial court did not give Hydrolve 15 days to object to the statement of decision as required by former California Rules of Court, rule 3.1590(f), now 3.1590(g).

10

On May 22, 2009, Perrott wrote TMS's attorneys that they intended to dismiss the fraud cause of action due to the " 'added time and expense of conducting a jury trial of this single cause of action.' "

On May 27, 2009, Hydrolve filed a dismissal of the fraud claim without prejudice. The dismissal occurred within the "safe harbor" period of section 128.7, subdivision (c)(1), which requires a party to wait 21 days after serving a section 128.7 motion before filing it in court, to allow the opposing party to withdraw its pleading and avoid possible sanctions.

On May 29, 2009, TMS submitted a proposed judgment, which said, " 'there remains no cause of action between said parties.' " On June 1, 2009, judgment was entered for TMS and Pullen.

Perrott noted that the Shasta trial court signed the judgment before the time period to register objections had lapsed,[11] and it was his belief that the judgment was inconsistent with the April 20, 2009, minute order indicating that the issue of promissory estoppel would be considered during the second phase of the trial. Consequently, on June 8, 2008, Downey filed an objection to the judgment on the ground that the court had not yet determined the promissory estoppel contention. The trial court took no action on the objection. On August 3, 2009, Hydrolve filed a notice of appeal, asserting among other things that the Shasta trial court erred by entering judgment before determining whether TMS was estopped to assert the statute of frauds defense. In October 2009, while the appeal was pending, Downey withdrew from representing Hydrolve because of non-payment of fees. This court dismissed the appeal on January 14, 2010.

---

[11] Rule 3.1590(j) provides: "Any party may, within 10 days after service of the proposed judgment, serve and file objections thereto." As noted, TMS submitted a proposed judgment on May 29, 2009, and the trial court entered judgment on June 1, 2009.

11

## II. The Malicious Prosecution Lawsuit

TMS and Patricia Pullen, individually and as executrix for the estate of Carl Pullen, filed a lawsuit in Sacramento County, against Hydrolve, Doran, Caldwell, Zeinfeld, Downey, Perrott, Lucas, ABC Corporations, and Black and White Companies. The only parties to this appeal are Downey, Frank Perrott, and James Lucas (the law firm and attorneys who represented Hydrolve in the Shasta County case), and Stephen Zeinfeld.

The complaint alleges malicious prosecution, negligent infliction of emotional distress, and wrongful death. The first count, malicious prosecution, recites the background of the Shasta lawsuit and alleges defendants initiated and perpetuated the Shasta lawsuit without probable cause, without reasonable belief that grounds existed for the action, with malice and for the improper purpose of attempting to coerce TMS and the Pullens into selling the property to Hydrolve. The complaint attaches the Shasta County trial court's statement of decision and quotes the findings that "no reasonable person" would have believed an enforceable contract existed, that there was "[n]o objectively tenable basis" for Hydrolve's claims, and that Hydrolve's witnesses lacked credibility. The complaint alleges damages for interference with use of TMS's real property, including loss of opportunity to sell to others, attorney's fees in defending the Shasta County suit, emotional distress, and physical illness.

The second count alleges negligent infliction of emotional distress on Mrs. Pullen individually. It alleges defendants owed her a duty to avoid causing her emotional distress by exercising due care in their conduct toward her husband. Defendants breached this purported duty by "maliciously prosecuting" the Shasta County suit, causing Mrs. Pullen emotional distress resulting in physical illness and economic damages "as she observed the severe adverse effects of such wrongful conduct on Mr. Pullen's emotional and physical health."

12

The third count, wrongful death, by Mrs. Pullen individually, alleges, "The wrongful acts of Defendants, and each of them, in maliciously initiating and continuing to prosecute Hydrolve's meritless claims against TMS and Mr. Pullen were a substantial factor in causing Carl Pullen's death on January 26, 2008."

On October 15, 2010, Downey filed a motion to strike the complaint under the anti-SLAPP law. On October 22, 2010, Zeinfeld filed his own anti-SLAPP motion, asserting grounds identical to those stated in Downey's motion.

Downey's motion asserted that Mrs. Pullen lacked standing to sue for malicious prosecution; prevailing on statute of frauds grounds was not a favorable termination which is required for malicious prosecution; Hydrolve's voluntary dismissal of the fraud claim to avoid litigation expenses was not a favorable termination on the merits; Downey had probable cause to initiate and continue the Shasta suit; Downey did not act with malice; and the claims for wrongful death and negligent infliction of emotional distress are barred by the statute of limitations, the litigation privilege, and absence of duty. Downey requested judicial notice of documents from the record of the Shasta County case, including the Shasta County trial court's statement of decision.

Downey also submitted the declarations of Lucas and Perrott. Perrott attested he reviewed the documents, including the documents we listed *ante*, which were submitted in connection with the motion to expunge the lis pendens in Shasta County. Perrott concluded Hydrolve had acquired a sole and exclusive right of first refusal and right to enter an agreement to purchase the property, that Hydrolve was to provide assistance to TMS to close the landfill, and TMS had the obligation to secure governmental approval to close the landfill. The Option agreement did establish a purchase price and said it constituted the full agreement of the parties but also said the parties contemplated additional agreements in the future. Perrott understood the "November 2005 term sheet" to be the " 'future agreement' " contemplated by the Option agreement. Perrott attested that, although the "November 2005 term sheet" was unsigned, it was his understanding

13

that the terms were negotiated at a face-to-face meeting between Doran and Pullen, they later met again and shook hands, and Pullen said " 'we have a deal' " and handed a key for the property to Doran.  Doran turned the key over to Downey for safekeeping.  Perrott attested he evaluated the possible application of the statute of frauds and concluded that the "August 2005 Option" and the initialed counterparts of the "November 2005 term sheet" could constitute an enforceable contract in light of the surrounding circumstances, and that TMS could be estopped from asserting the statute of frauds because TMS's representations and actions led Hydrolve to expend time and money based on its belief that the deal would go through.

Perrott acknowledged that Hydrolve's May 3, 2006, letter to TMS attached a writing with different terms and said its offer would be rescinded if TMS did not sign and return it by May 8th.  Perrott said that, since the letter was susceptible to an interpretation that the parties were still negotiating terms, Doran provided a declaration explaining that, after he informed Pullen that Hydrolve's investors were getting impatient with the delay due to TMS's failure to obtain government approval to close the landfill, Doran and Pullen discussed an alternative agreement for Hydrolve to assume responsibility for the government approvals, and TMS would give up its rights to any royalties from the planned aggregate mining.  Perrott stated that, based upon legal research, he concluded Doran's May 3, 2006, letter, "although imperfectly drafted by a layperson, appeared to be an offer of accord and satisfaction rather than the withdrawal of Hydrolve's original November 2005 offer to purchase the property."  Perrott stated he tried without success to negotiate a resolution before filing the Shasta County lawsuit.

Perrott also described subsequent discovery and proceedings in the Shasta County case as reinforcing his belief in the merit of his client's claim.  He said Pullen, in an untimely reply related to TMS's motion to expunge the lis pendens, presented an unsigned letter authored by Pullen dated November 22, 2005, purportedly showing there

14

was no agreement.[12]  Because no such letter had been produced in response to discovery requests, the court allowed Hydrolve to inspect the hard drive of the computer which generated the letter.  An inspection revealed that the computer's hard drive was replaced the day after the court continued a hearing to, among other things, allow Downey to inspect the hard drive.  Perrott said that Pullen's clerical person who prepared all of TMS's correspondence testified that she could not recall preparing, mailing, or faxing the letter.  Further, although TMS had a practice of keeping signed copies of all letters, it could not produce a signed copy of this letter.  Perrott believed this evidence could be used to impeach Pullen's credibility, whereas there we no documents produced to contradict Doran's version of the events.

Perrott attested Hydrolve voluntarily dismissed the fraud claim for economic reasons, not because it lacked merit.  He further indicated that the delay before the dismissal was also due to uncertainty about what would happen to the pending matter of whether TMS should be estopped from asserting the statute of frauds.  Downey later withdrew from representing Hydrolve while the case was pending on appeal, due to nonpayment of legal fees.

Perrott attested he acted in good faith in reliance upon the information he received from Hydrolve, his analysis and understanding of the documents, and information gleaned during discovery.  He did not knowingly elicit any false or misleading testimony.

TMS filed opposition to the anti-SLAPP motions.  TMS also filed objections to the Lucas and Perrott declarations and objections to the request for judicial notice.

---

[12]  The unsigned November 22, 2005, letter reads in pertinent part:  "I have disclosed to you all offers made from people to purchase the 160 acres in Millville.  However their terms and price was not acceptable to us, as well as your offer.  [¶]  When we decide to sell we will let you know our price or anyone who makes an offer you will know, as long as we have an option to match the price as agreed until August 8, 2006."

15

Downey filed a reply, responded to TMS's evidentiary objections, and filed objections to TMS's evidence. TMS filed a response to Downey's evidentiary objections.

The trial court's tentative ruling was to grant Downey's motion to strike the complaint but deny Zeinfeld's motion due to his failure to explain his role in the underlying action. After a hearing, the trial court in February 2011 issued its minute order "SUBMITTED MATTER RULING," ruling on the evidentiary objections and granting both motions to strike. The trial court issued formal written orders granting the motions to strike the complaint in March 2011 (for Zeinfeld) and April 2011 (for Downey), incorporating by reference the court's minute order explaining its reasoning.

The Sacramento trial court granted Downey's request for judicial notice and overruled TMS's evidentiary objections. The trial court sustained most of Downey's objections to factual findings in the Shasta statement of decision. The court wrote, "The court is not considering the truth or falsity of statements made in the declarations filed in the underlying case. As to the [Shasta] Statement of Decision, the Court is not considering rulings that were not necessary to the issue before the Shasta Superior Court."

The Sacramento trial court ruled that, as to Mrs. Pullen, the malicious prosecution claim failed because she was not sued in the prior action. Malicious prosecution is a personal claim.

As to TMS, the Sacramento trial court ruled that the contract claims did not terminate in TMS's favor for malicious prosecution purposes, because those claims were disposed of, not on the merits, but based on the statute of frauds, which is a procedural rather than substantive rule. The Sacramento trial court further observed that because the Shasta trial court bifurcated the issues, it did not consider the issue of promissory estoppel, which is a substitute for consideration and can be raised to defeat the statute of frauds.

16

The Sacramento trial court further wrote, "Defendants also contend that the voluntary dismissal of the fraud claim was not a favorable termination required for malicious prosecution. Downey contends that the dismissal of the fraud claim was based only on economic reasons. In opposition, plaintiff points to the pending CCP 128.7 motion that had been served on plaintiffs in the underlying action. A trier of fact could conclude from the fact that the fraud claim was dismissed during the safe harbor period that the dismissal of that claim was a favorable termination on the merits."

The Sacramento trial court ruled that Hydrolve's ultimate abandonment of the Shasta appeal after Downey withdrew from representation was not a favorable termination on the merits.[13]

The Sacramento trial court ruled that Downey presented ample evidence of probable cause for the Shasta lawsuit, including Perrott's declaration, supporting exhibits showing written memoranda of the parties' agreement, and Lucas's declaration. The Sacramento trial court ruled that TMS's opposition presented no admissible evidence of the absence of probable cause. The Sacramento judge said the Shasta judge's determination that no reasonable person would have believed the written memoranda could satisfy the statute of frauds was not necessary to the decision and therefore was not binding on the Sacramento trial court. Additionally, said the Sacramento trial court, the fact that the Shasta trial court had earlier overruled a demurrer to the Shasta complaint established that counsel had probable cause to file it. The Sacramento trial court said, "Plaintiffs contend that Downey should have known that the trial court would find that its client was not credible; however, plaintiff has presented no evidence that Downey should somehow have intuited or been aware that its clients were not 'telling the truth.' Plaintiff relies only on the allegations of the Complaint, the underlying statement of decision, and

---

[13] TMS does not contest this ruling in this appeal.

trial counsel Lew Garbutt's opinion. This is not evidence sufficient to support the second element of a malicious prosecution claim. Counsel is entitled to rely on information provided by their clients, including their sworn discovery responses, in making their determination of whether there is probable cause to bring the underlying action. [Citation.] [¶] The Court determines based on the evidence available to Downey that they had probable cause to bring and continue litigating the underlying claims for breach of contract, specific performance, and fraud."

As to malice, the Sacramento trial court ruled that Downey established absence of malice through the declarations of Perrott and Lucas. Even if TMS could show that Downey's clients had malice, that malice could not be imputed to the attorneys. Any credibility issues in the underlying case were for the trier of fact to evaluate. The court said TMS's section 128.7 motion was based on " 'knowing that the only witness to the alleged fraudulent misrepresentation (Kevin Doran) was himself proven to be a deceitful, conniving and wholly dishonest individual.' (Declaration of Lew Garbutt, para 7) However, TMS has pointed to no facts to show that Downey was aware of specific facts that its client was fabricating the fraud claim. Plaintiffs have presented no admissible evidence of malice as to either Downey or Zeinfeld."

The Sacramento trial court ordered the malicious prosecution claim stricken under section 425.16. As to the wrongful death and infliction of emotional distress claims, the court ruled that they also arose from protected activity in pursuing the Shasta County lawsuit and therefore were also subject to be stricken under section 425.16. As to the probability of prevailing, the Sacramento trial court ruled that the claims for wrongful death and infliction of emotional distress were barred by the two-year statute of limitations, because the complaint was filed more than two years after the death of Carl Pullen -- five and a half months too late. Additionally, these claims were based on Downey's communications in connection with litigation of the Shasta case and were therefore absolutely privileged under the litigation privilege of Civil Code section 47,

18

subdivision (b).  The court also ruled that Downey had no duty to Mr. and Mrs. Pullen in the Shasta lawsuit.

Downey and Zeinfeld filed separate motions for attorney fees, as authorized under section 425.16.  The trial court granted the motions and entered separate "JUDGMENT[S] OF DISMISSAL" which included awards of attorney fees and costs.

TMS filed a notice of appeal from the orders granting the anti-SLAPP motions. (§ 425.16, subd. (i) ["An order granting or denying a special motion to strike shall be appealable under Section 904.1."].)[14]

## DISCUSSION

### I.  Applicable Legal Standards and Principles

### A.  Section 425.16 Standards and Standards of Review

Section 425.16 authorizes the trial court to strike a cause of action arising from a person's exercise of the right of petition unless the court determines that the plaintiff has established a probability of prevailing on the cause of action.  The purpose is stated in subdivision (a):  "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.  The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.  To this end, this section shall be construed broadly."

Section 425.16 provides in pertinent part:  "(b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the

---

[14]  TMS presents no appellate challenge to the attorney's fees and costs, other than to say they must fail if we reverse the orders granting the section 425.16 motions.

19

court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim. [¶] (2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based. [¶] (3) If the court determines that the plaintiff has established a probability that he or she will prevail on the claim, neither that determination nor the fact of that determination shall be admissible in evidence at any later stage of the case, or in any subsequent action, and no burden of proof or degree of proof otherwise applicable shall be affected by that determination in any later stage of the case or in any subsequent proceeding. [¶] . . . [¶] (e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, . . . ."

"Resolution of an anti-SLAPP motion 'requires the court to engage in a two-step process. First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken "in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue," as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.' [Citation.]" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733 (*Jarrow Formulas*).)

In deciding an anti-SLAPP motion, the court considers the pleadings and evidentiary submissions of the parties, but does not weigh the credibility or probative

20

strength of the competing evidence. (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 105 (*Mann*).)

Review of an order granting a section 425.16 motion is de novo (*Mendoza v. Wichmann* (2011) 194 Cal.App.4th 1430, 1447 (*Mendoza*)), but we review claims of evidentiary error under an abuse of discretion standard. (*Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1348, fn. 3.) We consider the pleadings and supporting and opposing affidavits, but we neither weigh credibility nor compare the weight of the evidence. Rather, we accept as true the evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

Here, TMS does not dispute that Downey made a threshold showing that the challenged claim for malicious prosecution, as well as the claims for emotional distress and wrongful death derived from malicious prosecution, were claims arising from protected activity of exercising First Amendment rights to petition for redress of grievances. Therefore, the resolution of this case turns on the issue of whether TMS has demonstrated a probability of prevailing on its claims. (*Jarrow Formulas*, *supra*, 31 Cal.4th at p. 733.)

### B. Malicious Prosecution Elements

To establish a cause of action for malicious prosecution, a plaintiff must plead and prove that the underlying action was (1) commenced by or at the direction of the defendant and pursued to a legal termination in the plaintiff's favor, (2) brought or maintained without probable cause, and (3) initiated with malice. (*Mendoza*, *supra*, 194 Cal.App.4th at p. 1445.) We return to these elements, *post*.

21

## II.  Claims of Evidentiary Error

Before addressing the issue of whether TMS and Mrs. Pullen have established a probability of prevailing on their claims, we must first address purported evidentiary errors affecting their proof on that showing.

### A.  Judicial Notice of the Shasta County Superior Court Statement of Decision

TMS argues the findings in the Shasta trial court statement of decision that " '[n]o reasonable person' " would have believed the memoranda here constituted an enforceable contract, there was " 'no objectively tenable basis' " for Hydrolve's claims and that Hydrolve's witnesses lacked credibility, demonstrated the absence of probable cause for the Shasta County lawsuit, and TMS's probability of prevailing on the current claims. TMS argues the Sacramento County trial court committed evidentiary error by disregarding the factual findings in the Shasta trial court statement of decision.  We disagree.

TMS contends that, because Downey itself asked for judicial notice of the Shasta statement of decision without limitation, Downey could not thereafter restrict use of the statement of decision.  TMS cites authority that a party who intends to offer evidence for a limited purpose should identify the limitation when it offers the evidence and cases which discuss the requirement that when a party objects to evidence, that objection must be specific.  TMS asserts that refusing to consider the statement of decision without limitation is particularly unfair here because by the time the objection was made, it lost the opportunity to present other evidence to prove the facts it sought to establish through the statement of decision.  However, TMS has not said how it could have proven the trial court's findings concerning its subjective observations about the reasonableness and tenability of Hydrolve's contract claims and the credibility of the witnesses or what substitutes for this evidence it could have provided.

Certainly, counsel should be careful to specify exactly the document or portion of a document in a court file that is the subject of judicial notice.  (*Estate of Nicholas* (1986)

22

177 Cal.App.3d 1071, 1089.) On the other hand, we note that Downey never specified as the subject of the judicial notice request the Shasta statement of decision findings that no reasonable person would have thought the parties had enforceable contract, that the claims were untenable or that Hydrolve's witnesses lacked credibility.

In any event, the Sacramento trial court could not take judicial notice of the *truth* of another court's factual findings and it was not required to do so just because Hydrolve's request for judicial notice was not more specific. "[W]hile the existence of any document in a court file may be judicially noticed, the truth of the matters asserted in those documents, *including the factual findings of the judge who was sitting as the trier of fact*, *is not entitled to notice*." (*Steed v. Dept. of Consumer Affairs* (2012) 204 Cal.App.4th 112, 121, citing *Sosinsky v. Grant* (1992) 6 Cal.App.4th 1548, 1562-1570 (*Sosinsky*).)

As did the Sacramento trial court, we find *Plumley v. Mockett* (2008) 164 Cal.App.4th 1031 (*Plumley*), an anti-SLAPP case, to be instructive. In *Plumley* a patent holder (Plumley) and competing applicant (Mockett) fought over rights to a grommet. In a state court action filed by Plumley, alleging unfair competition and related claims, a California trial court made factual findings and ruled in favor of Plumley. (*Plumley*, at pp. 1037-1038.) In federal proceedings concerning interference with patent instituted by Mockett, the Board of Patent Appeals and Interferences (Board) ruled in Mockett's favor. However, Plumley ultimately prevailed after filing a complaint in federal court to set aside the Board's decision. (*Id.* at pp. 1039-1045.) Plumley then filed in state court a malicious prosecution action against Mockett and his attorney related to the federal matter Mockett had initiated. Mockett and his attorney in turn filed anti-SLAPP motions. The trial court denied the motions, and Mockett and his attorney appealed. (*Id.* at p. 1045.) In arguing that the trial court's denial of the anti-SLAPP motion should have been affirmed, Plumley asserted that the trial court's findings in the first state court action -- that Mockett's entire story as to where and how he got the idea for the grommet, who

23

thought of it first, and whether Mockett ever communicated it to Plumley was " 'completely and utterly false' " -- conclusively demonstrated the absence of probable cause to bring the interference action because the trial court's findings were the subject of an unopposed request for judicial notice and were entitled to collateral estoppel effect. (*Id*. at p. 1048.)

The *Plumley* court rejected the contention that trial court findings in the original state court case should have been received and credited because no one objected to the request for judicial notice of those findings. (*Plumley*, *supra*, 164 Cal.App.4th at p. 1050.) The *Plumley* court specifically noted " 'the taking of judicial notice that the judge *made* a particular factual finding is a far cry from the taking of judicial notice that the "facts" found by the judge must necessarily be the true facts.' " (*Ibid*., quoting *Sosinsky*, *supra*, 6 Cal.App.4th at p. 1565.) The court further reasoned, "Indeed, Plumley's contention that [the judge's] findings must be credited simply because they were judicially noticed 'appears to improperly merge the doctrine of judicial notice with the doctrines of res judicata and collateral estoppel.' [Citation.] 'It is the consequence of judicial notice that the "fact" noticed is, in effect, treated as true for purposes of proof. "Under the doctrine of judicial notice, certain matters are assumed to be indisputably true, and the introduction of evidence to prove them will not be required. Judicial notice is thus a substitute for formal proof. [Citation.]" [Citation.] Therefore, a finding of fact that was judicially noticed would be removed as a subject of dispute and would be accepted for evidentiary purposes as true. *The effect would be that without resort to concepts of collateral estoppel or res judicata that would litigate whether the issue was fully addressed and resolved, a finding of fact would be removed from dispute in the other action in which it was judicially noticed*.' [Citation.] [¶] In sum, while the trial court was entitled to take judicial notice of [the judge's] findings, it could 'credit' them—

24

i.e., accord them preclusive effect in this proceeding—only if the elements of collateral estoppel were satisfied. . . ." (*Plumley*, at pp. 1050-1051.)[15]

Collateral estoppel does not apply here. As noted by the *Plumley* court, collateral estoppel precludes relitigation of an issue only if: (1) the issue is identical to an issue decided in a prior proceeding; (2) the issue was actually litigated; (3) the issue was necessarily decided; (4) the decision in the prior proceeding is final and on the merits; and (5) the party against whom collateral estoppel is asserted was a party to the prior proceeding or in privity with a party to the prior proceeding. (*Plumley*, *supra*, 164 Cal.App.4th at pp. 1048-1049.) The *Plumley* court then held that collateral estoppel was inapplicable there because the issues were not identical, but even if all of the elements of collateral estoppel were met, it would not be applied in the context of the case before the court. Applying collateral estoppel would not have advanced the public policies underlying the collateral estoppel doctrine -- preserving the integrity of the judicial system, promoting judicial economy, and protecting against vexatious litigation. "To the contrary, doing so would violate well-established principles that litigants and attorneys

---

[15] TMS cites "the second edition of Bernard S. Jefferson's, *California Evidence Benchbook* §49.12" for the proposition that that a court may take judicial notice of the truth of the facts asserted in documents such as court orders, *findings of fact*, conclusions of law and judgments. TMS also relies on earlier cases which also state the same thing. However, in *Sosinsky,* the Fifth Appellate District expressly stated that it found "no sound legal basis" for the statement in Jefferson that a court could take judicial notice of the truth of findings of fact made by another court. (*Sosinsky*, *supra*, 6 Cal.App.4th at pp. 1564-1565.) The 2011 (and current) edition of Jefferson, which TMS does not cite, clarifies the application of the rule. "By making an order *establishing the law of the case*, it seems that the facts are no longer in dispute and can therefore be considered as true as set forth in an order, findings of fact, or conclusions of law." (2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2014) § 49.12, p. 49-9, italics added.) The italicized text referencing "the law of the case" makes clear that Jefferson is referring to a court taking judicial notice of findings of fact in the case in which the findings of fact were made, not some other case. The 2011 (and current) edition of Jefferson goes on to recognize the holdings in *Sosinsky* and *Plumley* (*ibid*.), holdings we consider to represent the modern view.

who bring a legally tenable action are not subject to liability for malicious prosecution simply because a trier of fact disbelieves their version of conflicting evidence and makes findings adverse to them. As our Supreme Court has said concerning the scope of liability for malicious prosecution, '[a] litigant or attorney who possesses competent evidence to substantiate a legally cognizable claim for relief does not act tortiously by bringing the claim, even if also aware of evidence that will weigh against the claim. Plaintiffs and their attorneys are not required, on penalty of tort liability, to attempt to predict how a trier of fact will weigh the competing evidence, or to abandon their claim if they think it likely the evidence will ultimately weigh against them. They have the right to bring a claim they think unlikely to succeed, so long as it is arguably meritorious. [Citation.]' [Citation.]" (*Id.* at p. 1050.)

TMS argues the Shasta judge's findings -- that " '[n]o reasonable person' " would believe the memoranda constituted an enforceable contract, and that there was " 'no objectively tenable basis' " for Hydrolve's claims -- can be considered as evidence that a subsequent trier of fact might well come to a similar conclusion. TMS also argues the Shasta judge's finding that Hydrolve's witnesses lacked credibility should be given preclusive effect because the Shasta judge necessarily had to decide whether Hydrolve's witnesses were credible in deciding the first issue outlined for the Shasta trial, whether there was an enforceable contract. We reject these arguments.

The Shasta trial court's findings about the reasonableness of the belief concerning whether the documents collectively constituted a valid contract and whether the claims were objectively tenable were not findings necessary to the conclusions of law the court was required to make. The issue identified by the court just before it began what it characterized as a "very limited bifurcated trial" was "are the terms there sufficient to satisfy the statute of frauds[?]" Thus, in granting the section 631.8 motion, the Shasta trial court needed only to conclude that the documents did not satisfy the statute of frauds. And even if the court also sought to determine whether there was an enforceable

26

contract,[16] a finding concerning the tenability of Hydrolve's claims was not relevant to that determination.

Moreover, regarding the credibility findings, the issue decided by the Shasta trial judge was not the same issue here. Even assuming the Shasta judge's factual findings could be used to preclusively determine that *Hydrolve*'s witnesses lacked credibility based on their trial performance, such a determination would not establish the key issues here -- that *Downey* or *Zeinfeld* acted without probable cause or with malice.

Furthermore, we agree with the *Plumley* court that policy considerations cut against application of collateral estoppel principles in the context of an anti-SLAPP motion in a malicious prosecution case, such as the case before us. For these reasons, collateral estoppel does not apply to the Shasta trial court findings against Downey or Zeinfeld here.

Lastly, we agree with Downey that the Shasta judge's opinion about the reasonableness and tenability of the contract claims and witness credibility is not the competent, admissible evidence required for opposing an anti-SLAPP motion. (*Gallagher v. Connell* (2004) 123 Cal.App.4th 1260, 1267 [to demonstrate a probability of success a plaintiff must provide competent evidence that would be admissible at trial and courts have barred evidence that would be inadmissible, including evidence barred by "the hearsay rule or because it is speculative, not based on personal knowledge or consists of *impermissible opinion testimony*." (Italics added.)].) So even assuming the Sacramento trial court could take judicial notice of the mere fact that the Shasta trial court made the specified findings without reference to whether the findings were true on

---

[16] Although the court, based on the pretrial submission of TMS, listed enforceability as a subject of this phase of the trial, the court told counsel at the beginning of the trial that it was separating enforceability out because of the prospect of having to prove ambiguities by extrinsic evidence. (See fn. 7, *ante*.) The record before us does not reflect that the court revised this oral ruling later in the trial.

the theory that the findings showed some other trier of fact might make the same findings, those findings would not be admissible in trial and thus, they are not admissible here.

We conclude the Sacramento trial court did not commit evidentiary error in refusing to consider the Shasta trial court statement of decision.

### B. Other Evidentiary Rulings

TMS also argues the trial court erred in other evidentiary rulings. We conclude TMS forfeits these matters by failing to present an adequate analysis and citation to the record. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [appellant must present reasoned argument]; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979; *In re Marriage of Nichols* (1994) 27 Cal.App.4th 661, 672-673, fn. 3 [reviewing court may disregard contentions unsupported by legal or factual analysis].)

Here, the entire argument in TMS's opening brief on appeal, under the subheading that the trial court erred in other evidentiary rulings, is: "The lower court sustained nearly all of defendants' objections to the declaration of Lew A. Garbutt, the attorney who defended TMS and Mr. Pullen in the Shasta County court. Several of these objections were directed to portions of the declaration in which Mr. Garbutt was merely verifying, under penalty of perjury, the unsworn factual statements he had made in the previously mentioned CCP §128.7 motion [for sanctions]. No reason was given as to why these positive statements were excluded from consideration. To do so was error. (See CCP §446; *Lindemann v. San Joaquin Cotton Oil Co*. (1936) 5 Cal.2d 480; *Patterson and Frisbie v. Ely* (1861) 19 Cal. 28.)"

TMS's argument is deficient. It fails to specify what statements of Garbutt it thinks were wrongly excluded, and fails to cite to the record for the evidence or the objections, as required by California Rules of Court, rule 8.204. TMS also fails to present any legal analysis as to the cited statute (§ 446, verification of pleadings) or the cited case law supporting the admissibility of the evidence or even explain why it

28

considers the evidence relevant. Even in the portion of the appellate brief setting forth the statement of facts, TMS's recitation of "THE PARTIES' EVIDENTIARY OBJECTIONS" does not explain the basis for the claim of "other" evidentiary error. Thus, we need not address the matter further.

TMS fails to show any evidentiary basis for reversal. We shall now turn to the sufficiency of TMS's probability of prevailing showing based on the admissible evidence.

## III. Failure to Show Probable Success on the Malicious Prosecution Claim

To show a probability of prevailing on the merits, TMS had to show the complaint was supported by a sufficient prima facie showing of facts to sustain a favorable judgment by presenting admissible evidence supporting every element of the cause of action. (*Jarrow Formulas*, *supra*, 31 Cal.4th at p. 741; *Mendoza*, *supra*, 194 Cal.App.4th at p. 1447.)

To prevail on the malicious prosecution claim, TMS had to present admissible evidence that: (1) Downey and Zeinfeld brought a lawsuit which terminated in TMS's favor; (2) they brought it without probable cause; and (3) they acted with malice.

### A. Favorable Termination

Whether the termination of a prior case is favorable to the defendant so as to support an action for malicious prosecution is not determined merely because the defendant prevailed. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 342 (*Casa Herrera*).) The termination must reflect the merits of the action and the plaintiff's innocence of the misconduct alleged in the lawsuit. (*Id.* at pp. 341-342.)

As for the contract claims, it is clear from the conclusions of law in the Shasta trial court statement of decision that the court grounded its decision on the application of the

29

statute of frauds.[17]  The statute of frauds is a procedural defense and thus the judgment here concerning the contract claims was not a favorable termination on the merits for purposes of malicious prosecution.  (*Hall v. Harker* (1999) 69 Cal.App.4th 836, 843-844, disapproved on other grounds in *Casa Herrera*, *supra*, 32 Cal.4th at p. 349 and *People v. Freeman* (2010) 47 Cal.4th 993, 1006, fn. 4.)

Furthermore, the Shasta trial court never made a ruling on the promissory estoppel contention; thus, for this additional reason, TMS fails to establish favorable termination on the merits on the contract claims.  TMS contends that there were findings of fact in the Shasta trial court statement of decision adverse to the promissory estoppel contention.  However, the trial court informed Hydrolve at the beginning of the trial that it need not present evidence on the issue of promissory estoppel during the first phase of the bifurcated trial, so we have no way of knowing whether Hydrolve's evidence in the first phase of the trial included all the evidence it intended to introduce on the promissory estoppel contention.  Moreover, the Shasta trial court never made conclusions of law specific to promissory estoppel; it never ruled that there was no estoppel or even that

---

[17]  The subheadings in the statement of decision under the heading, "CONCLUSIONS OF LAW," read as follows:  "There Was No Written Real Estate Sales Contract or 'Memorandum' Signed or Subscribed by Mr. Pullen on Behalf of TMS" and "There Was No Written Memorandum Signed or Subscribed by the Parties Containing the Essential Terms as Required by the Statute of Frauds."  In summarizing its conclusions, the statement of decision reads:  "Under all of the circumstances, there is no credible, reliable evidence from which the Court could reasonably conclude that there existed between TMS and Hydrolve a legally subscribed 'memorandum' or combination of documents containing the essential terms with the requisite certainty required for the Statute of Frauds . . . ."  Under the heading, "CONCLUSION," the statement of decision further establishes that the ruling is grounded on the application of the statute of frauds.  It reads in pertinent part:  "To hold otherwise under the evidence at trial and lack of credibility of plaintiff's principals, would defeat the very purpose of the writing requirement of the Statute of Frauds which '[] is intended to permit the enforcement of agreements actually reached, but to prevent enforcement through fraud or perjury of contracts never in fact made.' "

promissory estoppel had not been properly pled.[18]  At the beginning of the trial, the trial court indicated that the estoppel issue would be decided in the second phase of the trial, but no second phase took place.

However, there remains the matter of the fraud cause of action, which was terminated by Hydrolve's voluntary dismissal.  A voluntary dismissal can be considered a favorable termination for malicious prosecution purposes.  (*Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 218 (*Daniels*) [a voluntary dismissal is presumed to be a favorable termination on the merits, unless otherwise proved to a jury].)  Here, the facts are in dispute as to the reason for the dismissal.  In reviewing a section 425.16 ruling, we do not weigh credibility or compare the weight of the evidence.  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis West Realty*).)  Rather, we accept as true the evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it has defeated the plaintiff's evidence as a matter of law.  (*Ibid.*)  On appeal, Downey makes no argument that it defeated plaintiff's evidence as a matter of law such that its voluntary dismissal of the fraud claim cannot be considered a favorable termination for TMS.

TMS argues that if at least the fraud part of the Shasta suit terminated in TMS's favor, that would suffice to defeat the anti-SLAPP motion (provided TMS also showed a probability of success on the elements lack of probable cause and malice) because, as TMS argues, a showing of probability of success on a *portion* of the complaint in the prior lawsuit suffices to defeat an anti-SLAPP motion.  (*Oasis West Realty*, *supra*, 51 Cal.4th at p. 820 ["If the plaintiff 'can show a probability of prevailing on *any part of its*

---

[18]  Based on the record before us, it does not appear that there was compliance with section 631.8, subdivision (b), which allows the trial court to grant the motion "as to some but not all the *issues* involved in the action" (italics added) and then "proceed as to the issues remaining."  (See fn. 7, *ante*.)

*claim*, the cause of action is not meritless' and will not be stricken; 'once a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff *has established* that its cause of action has some merit and the entire cause of action stands.' "], quoting *Mann*, *supra*, 120 Cal.App.4th at p. 106.) In other words, if TMS showed that a portion of the prior lawsuit -- here, the fraud cause of action -- was maliciously prosecuted, then that would suffice to defeat the anti-SLAPP motion in its entirety and reinstate the entire lawsuit on all malicious prosecution theories. (*Oasis West Realty*, at p. 820; *Mann*, at p. 106.)

Accordingly, we move to the other two elements of malicious prosecution and conclude that the appeal fails, because TMS has not made an adequate showing that Downey or Zeinfeld pursued any of the Shasta claims without probable cause or with malice.

### B. Inadequate Showing of Lack of Probable Cause

The admissible evidence establishes that Downey had probable cause.[19] Probable cause in the context of malicious prosecution is a low threshold designed to protect a

---

[19] As a separate reason for finding probable cause, the Sacramento trial court ruled the Shasta trial court rulings on the demurrers established probable cause, citing *Swat-Fame, Inc. v. Goldstein* (2002) 101 Cal.App.4th 613, 626, disapproved on another ground in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 532, fn. 7, and *Zamos v. Stroud* (2004) 32 Cal.4th 958, 973 (*Zamos*). Downey makes the same argument on appeal. TMS does not address this argument. We need not consider this separate basis, but we do note the court in *Ross v. Kish* (2006) 145 Cal.App.4th 188, distinguished *Swat-Fame*. The *Ross* court wrote, "*Swat-Fame* is distinguishable. *Swat-Fame* addressed whether a false statement was actionable as fraud or merely constituted a statement of opinion. In overruling a demurrer to the complaint, the trial court found the allegations of the complaint were true to the best of the attorneys' knowledge at the time the complaint was filed. Thus, the attorneys had probable cause to bring the claim for fraud. No similar finding of fact was made in connection with the order overruling Ross's demurrer. Thus, Kish's ability to plead causes of action for breach of contract and legal malpractice that survived Ross's demurrer does not indicate he had probable cause to file the action in the first instance."

litigant's right to assert arguable legal claims even if they are extremely unlikely to succeed. (*Plumley*, *supra*, 164 Cal.App.4th at p. 1047.) Probable cause exists if, at the time the claim was filed, *any* reasonable attorney would have thought the claim tenable. (*Jarrow Formulas*, *supra*, 31 Cal.4th at p. 742.) Probable cause may be present even where a lawsuit lacks substantial merit. Reasonable lawyers may disagree; some may see a suit as meritless and other lawyers see the same suit as only marginally meritless. (*Id.* at p. 743, fn. 13.) Only the subset of suits "which *all reasonable lawyers agree totally lack merit*" lack probable cause. (*Ibid*., italics added.) " ' "Probable cause is lacking 'when a prospective plaintiff and counsel do not have evidence sufficient to uphold a favorable judgment or information affording an inference that such evidence can be obtained for trial.' " ' [Citation.]" (*Daniels*, *supra*, 182 Cal.App.4th at p. 222.) "In general, a lawyer 'is entitled to rely on information provided by the client.' [Citation.] If the lawyer discovers the client's statements are false, the lawyer cannot rely on such statements in prosecuting an action. [Citations.]" (*Id*. at p. 223.)

In *Daniels*, the court held that a plaintiff in a malicious prosecution suit made a sufficient showing to defeat an anti-SLAPP motion by the defendants, attorneys who filed a prior slander suit that was dismissed based on their client's refusal to comply with discovery obligations. (*Daniels*, *supra*, 182 Cal.App.4th at pp. 210-211, 222-224.) The slander complaint was bare bones, and the lawyers never disclosed *any* information, documents, or other details supporting the claims in the underlying litigation. (*Id*. at p. 223.) To be actionable as slander, the remarks must have been made in the presence of persons other than the alleged victim, yet it appeared from the record that the attorneys may not have obtained the identities of these individuals from their client before filing the slander suit. (*Id*. at pp. 223-224.) The client's persistent refusal to supply the names of

---

(*Ross*, at p. 203.) Similarly, no findings of fact were made in connection with the demurrers in this case.

alleged witnesses in discovery arguably put the lawyers on constructive notice at some point after filing the slander suit that there was no probable cause. (*Id.* at p. 224.) "[T]he absence of any witnesses, documents, or other evidence in support of Young's allegations in the prior litigation is a sufficient prima facie showing at this stage to find [the plaintiff] has a probability of prevailing on the element of probable cause." (*Ibid.*)

Here, in contrast, there were witnesses and documents supporting the initiation and continued prosecution of Hydrolve's suit against TMS, as set forth in detail *ante*. That evidence included Pullen's own deposition admissions and admissions to third parties that he had agreed to sell the property to Hydrolve. It also included evidence indicating Pullen attempted to fabricate evidence by submitting an unsigned letter disclaiming any agreement and then substituting the hard drive on the computer where the letter was created the day after the court ordered Hydrolve be given access to the computer to determine the authenticity of the letter.

TMS's argument in opposition about lack of probable cause depends to a large extent on the Shasta trial court's findings in the statement of decision. For example, TMS says Perrott attested to his "understanding" of various things, which presumably came from Doran, whom the Shasta judge disbelieved. However, as we have explained, TMS cannot rely on the Shasta trial court's credibility determinations as evidence. The credibility determinations, as well as the findings that no reasonable person would believe the documents constituted an enforceable contract and that there was "no objectively tenable basis" for Hydrolve's claims are inadmissible here. Moreover, as for the credibility findings, the Shasta trial court's conclusion about credibility occurred after hearing trial testimony and would not establish that Downey or Zeinfeld lacked probable cause at the time of filing the prior action or preparing it for trial.

TMS argues Perrott's " 'understanding' " was immaterial, because the test for probable cause is objective, not subjective. However, the court makes its objective determination of the reasonableness of the defendant's conduct in prosecuting the prior

lawsuit "on the basis of the facts known to" the defendant. (*Zamos*, *supra*, 32 Cal.4th at p. 971.) It was appropriate for the court to consider what information was given to the lawyers by their client.

With respect to the fraud claim, TMS cites the Sacramento trial court's reasoning regarding the favorable termination element. TMS characterizes the court's reasoning as concluding a trier of fact could find that the "threat of sanctions was the real motivation" for dismissing the fraud claim during the statutorily proscribed safe harbor period. From this, TMS argues the Sacramento trial court failed to recognize that the same set of facts which would permit a trier of fact to infer that Hydrolve dismissed the fraud claim due to the threat of section 128.7 sanctions, would also permit a trier of fact to infer that the dismissal constituted an admission that Hydrolve lacked probable cause for the fraud claim and acted with malice in filing the claim and/or in continuing to pursue it after the defeat of the contract claims. This argument distorts the Sacramento trial court's ruling.

The Sacramento trial court ruled, "A trier of fact could conclude from the fact that the fraud claim was dismissed during the safe harbor period that the dismissal of that claim *was a favorable termination on the merits*." (Italics added.) In so doing, the court did not make any findings related to Downey's perception of the merits at any point prior to the dismissal.

The only fact which would permit a trier of fact to conclude that Hydrolve dismissed the fraud claim due to a threat of sanctions was that Hydrolve dismissed the fraud claim after the section 128.7 motion was served, within the safe harbor period. But the dismissal came less than three weeks after the motion was served. And by that point, the Shasta trial court had issued its statement of decision, rejecting the contract claims. For the period before that point and thereafter, no admissible evidence is cited by TMS which would show lack of probable cause or malice regarding the fraud claim. The relatively slight delay of two months between the issuance of the statement of decision and the voluntary dismissal is inconsequential. Nothing happened on the fraud claim,

35

other than to schedule a trial date months away. And during that time, Downey was trying to get resolution from the trial court on the pending promissory estoppel contention before wrapping up the case, a resolution Downey never got.

As for the Sacramento trial court's statement that "[a] trier of fact could conclude from the fact that the fraud claim was dismissed during the safe harbor period that the dismissal of that claim was a favorable termination on the merits," that statement went to the element of favorable termination, not probable cause. The court *granted* the anti-SLAPP motion, noting that to prevail on a malicious prosecution claim plaintiffs must plead and prove not only that the underlying lawsuit terminated in their favor, but also that it was brought without probable cause, and was initiated with malice. Based on the admissible evidence, the Sacramento trial court determined Downey had probable cause to bring and continue the underlying claims for breach of contract, specific performance, and fraud, and plaintiffs presented no admissible evidence of malice. Even assuming the motive for dropping the fraud claim was to avoid possible sanctions, that would not mean Downey knew, or had reason to know, before trial that the fraud claim was meritless.

We conclude TMS failed to make a sufficient showing of lack of probable cause to defeat the anti-SLAPP motion. This defect in itself justified the granting of the anti-SLAPP motion. We nevertheless briefly address malice, because TMS failed to make a sufficient showing on that element as well.

### B. Inadequate Showing of Malice

" '[T]he "malice" element . . . relates to the *subjective intent or purpose* with which the defendant acted in initiating the prior action. [Citation.]' " (*Daniels*, *supra*, 182 Cal.App.4th at p. 224.) To establish malice, the plaintiff must prove " 'actual ill will *or* some *improper* ulterior motive.' " (*Ibid*.) "If the prior action was not objectively tenable, the extent of a defendant's attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice." (*Id*. at pp. 224-

36

225.)  Even assuming an attorney's client had malice, the client's malice is not imputed to his attorneys.  (*Id.* at p. 225.)

Here, Perrott and Lucas, submitted declarations that they believed the allegations were true and acted in good faith and reasonably relied on information provided to them by their clients in initiating and litigating the underlying case.  TMS presented no admissible evidence contradicting the declarations.  The Shasta trial judge's conclusion that Hydrolve witnesses lied at trial does not constitute evidence that the lawyers had any reason to suspect that anyone would lie at trial or that the lawyers acted with malice at any time.  And as we have noted, within two months after the Shasta statement of decision issued, Downey filed the dismissal of the fraud claim without prejudice.

TMS argues malice is shown by the fact that Downey filed a lis pendens in the Shasta County suit, which was not necessary, which tied up the property, and which was expunged by the court upon a finding that the claim lacked probable validity (§§ 405.3, 405.32).  However, the court's ruling went only to the contract claims and was grounded on its finding that "[t]he intention of the parties is *not clear from the face* of the written document.  It is thus *ambiguous* whether the document represents a meeting of the minds."  (Italics added.)  The court did not conclusively state that no contract existed or that a contract could not be established through extrinsic evidence.  Perrott noted as much in his declaration, and attested that he believed the trial court's characterization of the contract as "ambiguous" opened the door to future consideration of extrinsic evidence.

TMS argues any first-year law student would know that offer and acceptance and a meeting of the minds are essential.  TMS speculates that Downey must therefore have violated Business and Professions Code section 6068 by seeking to mislead the court by artifice or false statement of fact or law.  Therefore, according to TMS, Downey must have acted with malice by pursuing the lawsuit after the ruling on the lis pendens.  TMS's argument is deficient.  Even assuming for the sake of argument that TMS had succeeded in showing an absence of probable cause, a lack of probable cause is insufficient, by

37

itself, to show malice.[20] (*Jarrow Formulas*, *supra*, 31 Cal.4th at p. 743.) While lack of probable cause may be relevant, it must be supplemented by other, additional evidence. (*Daniels*, *supra*, 182 Cal.App.4th at p. 225.) No other admissible evidence has been presented here.

We conclude TMS failed to present sufficient evidence showing a probability of success on the malicious prosecution claim because its evidence of lack of probable cause and malice was insufficient.

### V. Wrongful Death and Infliction of Emotional Distress

Mrs. Pullen argues the trial court erred in ruling that her claims for wrongful death of her husband and negligent infliction of emotional distress were barred by the one-year statute of limitations for attorney malpractice (*Vafi v. McCloskey* (2011) 193 Cal.App.4th 874, 880 [section 340.6 applies to claims of malicious prosecution by an attorney]),[21] by the two-year statute of limitations (§§ 335-335.1 [two years to file action for "injury to, or for the death of, an individual caused by the wrongful act or neglect of another"]), the litigation privilege (Civ. Code, § 47, subd. (b)), and of the failure to establish a duty.

We need not address these arguments, because the failure to show a probability of success on the malicious prosecution claim also defeats the claims for wrongful death and negligent infliction of emotional distress, which were both predicated entirely on the claim of "malicious" prosecution of the Shasta County lawsuit. The claim for negligent infliction of emotional distress alleged defendants breached a duty of care to Mrs. Pullen by "maliciously prosecuting Hydrolve's purported claims against Mr. Pullen." The claim for wrongful death alleged as defendants' wrongful acts "maliciously initiating and

---

[20] Nor is evidence of possible negligence in conducting factual research enough on its own to show malice. (*Jarrow Formulas, supra*, 31 Cal.4th at p. 743.)

[21] At oral argument, Downey asserted our high court's recent decision in *Lee v. Hanley* (2015) 61 Cal.4th 1225 reinforces this argument.

continuing to prosecute Hydrolve's meritless claims against TMS and Mr. Pullen," which "were a substantial factor in causing Carl Pullen's death on January 26, 2008."

## VI.  Zeinfeld

We are at a loss to understand TMS's theory as to Zeinfeld.  TMS presented no evidence in the Sacramento trial court as the probability of success specific as to Zeinfeld; they made no showing of lack of probable cause or malice.  On appeal, TMS asserted no arguments in its briefing pertaining to the proof of these elements as to Zeinfeld.  Instead, TMS focused solely on the attorney defendants.  At oral argument, we asked counsel for TMS about this failure.  Counsel replied that it had no evidence regarding Zeinfeld related to the anti-SLAPP motion and that it would have to develop that evidence in discovery.  Thus, there has been a complete failure to present any evidence as to Zeinfeld.  For this additional reason, TMS's appeal from the trial court's order granting the Zeinfeld's anti-SLAPP motion fails.

## VII.  Conclusion

We conclude TMS and Mrs. Pullen have failed to show any ground for reversal of the orders granting the section 425.16 motions or the judgments which incorporated awards of attorney fees.

## DISPOSITION

The orders granting the section 425.16 motions and the judgments are affirmed. Respondents will recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                                       MURRAY        , J.


We concur:


      NICHOLSON     , Acting P. J.


      ROBIE         , J.